[No. F013523. Fifth Dist. July 17, 1991.]

THE PEOPLE, Plaintiff and Respondent, v.
DAVID ALLEN BORAGNO, Defendant and Appellant.

[No. F014771. Fifth Dist. July 17, 1991.]

In re DAVID ALLEN BORAGNO on Habeas Corpus.

**[Opinion certified for partial publication.†]**

†Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts I through III.

## COUNSEL

Eric M. Weaver, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Richard B. Iglehart, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Edgar A. Kerry and Jane Olmos, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**MARTIN, Acting P. J.**—David Allen Boragno, appellant, was charged with assault with a deadly weapon in violation of Penal Code section 245, subdivision (a)(1).[1] It was further alleged that appellant used a deadly weapon within the meaning of section 12022, subdivision (b), later amended to allege subdivision (d) of that same section, and that appellant intended to and did inflict great bodily injury within the meaning of section 12022.7.

A jury convicted appellant as charged on December 7, 1989. He was sentenced to a total term of six years, ordered to pay a $150 restitution fine and was given 132 days credit for time served.

Appellant filed a timely notice of appeal. A petition for writ of habeas corpus was subsequently filed and, upon motion of appellant, the actions were ordered consolidated by this court on January 7, 1991.

### FACTS

Clovis Police Officer Dean Menard arrived at apartment 103 at 3140 Peach Avenue in Clovis, California, on December 6, 1988, at approximately 10:37 a.m. He walked up to the fence, peered through the cracks and observed a pool of blood and a female, later identified as Linda Gonzales, lying on her back bleeding from a head wound. The front door of the

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

apartment was standing open and Menard could hear a man talking on the telephone for approximately 15 seconds. He then heard the telephone receiver being replaced and observed appellant walk toward the doorway holding a baseball bat. Upon inquiry, appellant identified himself as "David. I live here. They tried to break in. I hit her. But they got away. I only hit her once." Menard instructed appellant to exit the apartment and put the bat down.

Officer Henry, the first backup officer to arrive, detained appellant and took him away from the scene for his own protection and the protection of any evidence at the scene. Appellant was cooperative, seemed upset but was not handcuffed.

As Officer Henry escorted appellant to the lawn area of the complex, appellant said that he had heard the apartment door rattling, walked into his living room and saw Gonzales and two males inside his apartment. The female had a gun. Appellant said that he had been robbed before and that he feared for his family's safety. He attacked the three of them with a baseball bat and Gonzales threw the gun to one of the males. Appellant hit Gonzales with the bat as the males fled. Appellant said that he "went berzerk [sic]." Sergeant Terosian arrived and entered the apartment with Henry and Menard to check for additional suspects or victims. They conducted a room-by-room search. In the living room, Terosian observed a bloodstain on the carpet within four feet of the door. In the bedroom he observed a rifle. He also noted that the bed appeared to have been slept in but had no opinion as to whether the condition of the bedroom indicated that a struggle had occurred. This initial sweep for further suspects and/or victims took approximately one minute. Later, Menard, Detectives Lechko and Uzzell reentered the apartment and remained inside for about 30 minutes. They discovered a syringe and needle on the floor about one and a half feet from the body of the female victim and located some jewelry, boots and a purse as well as a bucket and cleaning supplies by the door. No weapon was found near the victim.

Detective Uzzell also observed a woman's purse, containing Ms. Gonzales's identification. A gold chain and wedding ring set were located under the purse. Uzzell remained at the crime scene for approximately four to five hours. During that time the laboratory experts from the Department of Justice arrived, photographed the scene and searched for further evidence. Detective Fannon went through the victim's purse to identify her. Inside the purse he found a makeup kit which included a condom. He subsequently noticed a "goldish-colored condom" in a photograph taken of the scene. He failed to notice it while at the scene itself. He testified that he returned to the

scene at 11 p.m. that day and the Department of Justice laboratory people were still there and had been there all that time.

Fannon checked Gonzales's criminal background which included a record of prostitution and narcotics offenses.

Vincent Escandon, Gonzales's cousin, testified that she lived with him at the time of the incident; that she had her own room and did not have a gun. Olivia Gonzales, the victim's sister, testified that Linda had suffered a short- and long-term memory loss and could not recall anything about the incident in which she was injured and battered.

Dr. Jonathan Lane treated Linda Gonzales in the emergency room. She had substantial trauma to both arms, groin and head. He found four head lacerations. Her cheekbone was caved in and she had a large laceration on her chin. She had sustained two skull fractures, two breaks in her jaw, a ruptured spleen and liver. There was evidence of brain swelling indicating brain injury. He estimated that the victim had been struck approximately 17 times.

Kenneth Penner, a California Department of Justice criminalist, examined the droplets of blood splattered on the victim's shoes. The smallness of the blood droplets indicated the blood was moving at a high velocity. There were two areas of blood in the apartment, a bloodstain that had drained from a person about five feet from the door and a separate bloodstain indicating that something had been dragged through the blood. There were no footprints in the second stain and no blood streaks across the aluminum threshold. The blood smears on the victim's shoes suggested the possibility that she had been dragged across the bloodstain.

Blood droplets were also located on a Christmas tree tablecloth, on a purple hamper near the east wall of the apartment and on the top four inches of the bat. There were also small droplets in the patio area which indicated that blood flew at a high velocity of speed.

Penner collected hairs from the sheets in the master bedroom and compared them with hairs taken from the victim, appellant and appellant's wife. He found hairs which did not belong to appellant or his wife but could have come from the victim.

Penner also examined the rape kit taken from the victim at the hospital. She had an intact spermatozoa cell in her vagina which could have been there as long as 24 hours. He found type A blood factors in the victim's vagina and she has a type O blood. According to Penner, if a man used a

condom and ejaculated, sperm could still reach the vagina. No semen was found on the victim's clothes.

Appellant made a statement to the authorities after he had been transported to the police station. A tape recording of the statement was played to the jury.

A San Luis Obispo County deputy sheriff testified he went to appellant's apartment in San Miguel, California, on September 6, 1988, about three months before the Clovis incident. At that time appellant reported his apartment had been burglarized. The deputy sheriff observed evidence of a break-in. Appellant told the deputy that he had been in Fresno when the burglary occurred but did not, contrary to a subsequent statement made by appellant to Clovis police officers, say anything at the time about being attacked with nunchakus and appellant only described one suspect.

Sometime in the early part of December of 1988, after appellant was arrested, Judy Barr assisted appellant's wife in moving out of the apartment. Her son found a condom. It was shown to appellant's wife who appeared to be surprised and got some toilet paper from the bathroom and took it away. Barr went into the master bedroom and there found a condom wrapper located between two Coke bottles.

Rodney Hylton, an investigator with the Fresno County District Attorney's office, executed a search warrant for appellant's person on November 2, 1989. He was searching for an orange or yellow condom and the package it came in. When Hylton arrived, appellant was getting out of his own vehicle. Hylton approached appellant, informed him that he had a warrant for his person and searched him. Appellant told him that he no longer had the condom and packaging in his possession because his attorney had advised him that he could either keep it or throw it away so he had thrown it away.

*Defense*

Appellant's mother-in-law testified that on the night of December 5, 1988, appellant and his family stayed at her house due to the fog. Appellant left the following morning around 10 a.m. and 20 minutes later called and asked for his wife. That telephone conversation took approximately five minutes.

Two other witnesses testified as to appellant's good reputation.

Discussion

I-III.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

IV. Ineffective Assistance of Counsel

 Appellant complains that after a one-minute sweep of the apartment for additional suspects or victims the apartment was cordoned off with yellow evidence tape and further investigations occurred for an additional thirteen hours, until at least 11 p.m., without the benefit of a search warrant. Trial counsel did not move to suppress the fruits of the warrantless search and, as a result, appellant contends that he was afforded ineffective assistance of counsel.

 Under both the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution, a criminal defendant has the right to the assistance of counsel. (E.g., *Strickland* v. *Washington* (1984) 466 U.S. 668, 684-685 [80 L.Ed.2d 674, 691-692, 104 S.Ct. 2052]; *People* v. *Pope* (1979) 23 Cal.3d 412, 422 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].) The ultimate purpose of this guaranty is to protect the defendant's fundamental right to a trial that is both fair in its conduct and reliable in its result. (*People* v. *Ledesma* (1987) 43 Cal.3d 171, 215 [233 Cal.Rptr. 404, 729 P.2d 839].)

"Construed in light of its purpose, the right entitles the defendant not to some bare assistance but rather to *effective* assistance. (E.g., *Strickland*, *supra*, 466 U.S. at p. 686 . . . ; *Pope*, *supra*, 23 Cal.3d at pp. 423-424.) Specifically, it entitles him to 'the reasonably competent assistance of an attorney acting as his diligent conscientious advocate.' [Citations.]" (*Ibid.*)

 A successful claim of ineffective assistance of counsel requires a showing that the attorney's deficient representation resulted in the withdrawal of a potentially meritorious defense. (*People* v. *Pope, supra*, 23 Cal.3d 412, 425.) The court may also find ineffective assistance of counsel if the petitioner establishes that counsel failed to perform with reasonable competence and it is reasonably probable a determination more favorable to the petitioner would have resulted if counsel had performed within reasonable standards. (*People* v. *Fosselman* (1983) 33 Cal.3d 572, 584 [189 Cal.Rptr. 855, 659 P.2d 1144].)

*See footnote, *ante*, page 378.

Appellant acknowledges that appellant's Fourth Amendment rights were not violated by the quick warrantless sweep of the premises for additional victims or suspects. (*Mincey* v. *Arizona* (1978) 437 U.S. 385, 392 [57 L.Ed.2d 290, 300, 98 S.Ct. 2408]; *Tamborino* v. *Superior Court* (1986) 41 Cal.3d 919, 924 [226 Cal.Rptr. 868, 719 P.2d 242].) However, appellant complains that the 13-hour search of the house exceeded the scope of the reasonableness of the search justified due to exigency circumstances.

We begin with the premise that searches conducted without prior approval by a judge or magistrate are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions. (*Katz* v. *United States* (1967) 389 U.S. 347, 357 [19 L.Ed.2d 576, 585, 88 S.Ct. 507]; see also *Mincey* v. *Arizona, supra,* 437 U.S. at p. 390 [57 L.Ed.2d at pp. 298-299].) The prosecution has the burden of establishing that a warrantless search falls within one of the exceptions. (*Mincey* v. *Arizona, supra,* 437 U.S. 385, 390-391 [57 L.Ed.2d 290, 298-299].) Respondent argues that the entries and search of the premises here fell within the exception established for exigent circumstances.

In *People* v. *Ramey* (1976) 16 Cal.3d 263, 276 [127 Cal.Rptr. 629, 545 P.2d 1333], our California Supreme Court defined exigent circumstances as "an emergency situation requiring swift action to prevent imminent danger to life or serious damage to property, or to forestall the imminent escape of a suspect or destruction of evidence."

Where, as here, the exigent circumstances rest on a claimed imminent threat of danger to life and property, we apply the two-part test articulated in *People* v. *Dickson* (1983) 144 Cal.App.3d 1046, 1063 [192 Cal.Rptr. 897]: "First, the objective test: was the threat so imminent and serious a reasonable policeman would believe that a warrantless, emergency entry was necessary to save lives and property? And, second, the subjective test: was this officer indeed motivated primarily by a desire to save lives and property?" It appears that the initial emergency had dissipated after the officers had conducted the initial sweep of the premises and had voluntarily left the premises. Thus, it appears there were no sufficient exigent circumstances to justify the second warrantless entry and seizure. (*People* v. *Blackwell* (1983) 147 Cal.App.3d 646, 651-652 [195 Cal.Rptr. 298].)

This was not a situation where the initial entry was terminated because the officers were concerned for their safety (see, e.g., *People* v. *Hamilton* (1980) 105 Cal.App.3d 113 [164 Cal.Rptr. 153]; *People* v. *Superior Court* (*Quinn*) (1978) 83 Cal.App.3d 609 [147 Cal.Rptr. 921]) or the physical condition of the premises prevented the officers from completing their initial inspection and eliminating the source of danger or the risk of destruction of evidence.

(See, e.g., *Michigan* v. *Tyler* (1978) 436 U.S. 499 [56 L.Ed.2d 486, 98 S.Ct. 1942]; *Cleaver* v. *Superior Court* (1979) 24 Cal.3d 297, 302 [155 Cal.Rptr. 559, 594 P.2d 984].) Rather, here as in *Mincey* v. *Arizona, supra,* 437 U.S. 385, *People* v. *Bradley* (1982) 132 Cal.App.3d 737 [183 Cal.Rptr. 434] and *People* v. *Blackwell, supra,* 147 Cal.App.3d 646, 652, there was an initial emergency which ceased to exist before the warrantless reentry. There is no "murder scene exception" to the warrant requirement. (*Mincey* v. *Arizona, supra,* 437 U.S. 385, 395 [57 L.Ed.2d 290, 302].)

We next consider to what extent appellant consented to the search of his home when he permitted entry of the officers upon their arrival at the scene and if it can be implied that the appellant consented to a further search.

In *Thompson* v. *Louisiana* (1984) 469 U.S. 17 [83 L.Ed.2d 246, 105 S.Ct. 409], several sheriff's deputies arrived at petitioner's home in response to a report by petitioner's daughter of a homicide. According to the daughter, petitioner had shot her husband, and then ingested a quantity of pills in a suicide attempt, and then changing her mind, called her daughter, informed her of the situation and requested help. The daughter then contacted the police. Upon their arrival, the daughter admitted them into the house and directed them to the rooms containing petitioner and the victim. After the police removed petitioner to the hospital and secured the scene, they conducted a general exploratory search for evidence of a crime. This search lasted approximately two hours. During the search, the officers found a pistol inside a chest of drawers in the same room as the victim's body, a torn up note found in a wastepaper basket in an adjoining bathroom, and another letter (alleged to be a suicide note) found folded up inside an envelope containing a Christmas card on the top of a chest of drawers. The general exploratory search for evidence was conducted after the premises had already been searched for other victims or suspects. (*Id.* at pp. 19-20 [83 L.Ed.2d at pp. 249-250].)

The *Thompson* court pointed out that in *Mincey* "we unanimously rejected the contention that one of the exceptions to the Warrant Clause is a 'murder scene exception.' Although we noted that police may make warrantless entries on premises where 'they reasonably believe that a person within is in need of immediate aid,' [*Mincey* v. *Arizona, supra,* 437 U.S. at 392], and that 'they may make a prompt warrantless search of the area to see if there are other victims or if a killer is still on the premises,' *ibid.,* we held that 'the "murder scene exception" . . . is inconsistent with the Fourth and Fourteenth Amendments—that the warrantless search of Mincey's apartment was not constitutionally permissible simply because a homicide had recently occurred there.' " (*Thompson* v. *Louisiana, supra,* 469 U.S. at p. 21 [83 L.Ed.2d at p. 251].) The court in *Thompson* concluded that "Petitioner's call

for help can hardly be seen as an invitation to the general public that would have converted her home into the sort of public place for which no warrant to search would be necessary." (*Thompson* v. *Louisiana, supra,* 469 U.S. at p. 22 [83 L.Ed.2d at pp. 251-252].)[2]

In *People* v. *Superior Court (Arketa)* (1970) 10 Cal.App.3d 122 [89 Cal.Rptr. 316], defendant Gonzales was advised by an officer that officers believed they had observed someone run into his house and that they would like to enter the house to see if they could find him. Defendant Gonzales replied that there were persons in the house and that the officers could come in if they wished. The officers entered the house and eventually found a three-foot crowbar located in the closet of a bedroom. (*Id.* at p. 125.) The court held the search and seizure of the crowbar was unlawful stating: "At best, the consent given by defendant Gonzales to the officers authorized them to enter his premises to look for a man who might answer the description of the person seen running towards the house. It did not extend to a thorough search of the house, including its closets, to uncover a crowbar. There is no showing made by the People that the officers had ever advised Gonzales that such a crowbar might be in his premises or that they desired to look for it. *The authority to search pursuant to a consent must be limited to the scope of the consent.*" (10 Cal.App.3d at p. 127, italics added.)

*People* v. *Timms* (1986) 179 Cal.App.3d 86 [224 Cal.Rptr. 434] ruled that once the police were summoned to Timms's premises because of a homicide they could make a prompt warrantless search of the premises to see if there were any other victims or suspects on the premises, but emergency calls do not imply consent to unlimited, warrantless searches. The fact that Timms did not object to officers remaining on the premises after he was taken to the police station does not translate into a consent to the general exploratory search of his residence. (*Id.* at p. 92; *People* v. *Nelson* (1985) 166 Cal.App.3d 1209, 1215 [212 Cal.Rptr. 799].)

In *Mincey* v. *Arizona, supra,* 437 U.S. 385, the Supreme Court invalidated an exhaustive exploratory search of a residence which lasted four days and for which the sole justification advanced for lack of a warrant was the fact that the residence was the scene of a recent homicide. Moreover, before the search commenced, the suspect had been arrested and no additional victims were suspected.

---

[2]It should be noted the prosecution in *Thompson* tried to justify the search on the basis of consent and pointed to the daughter's apparent authority over the premises when she originally permitted the police to enter. Since the Louisiana Supreme Court's decision does not attempt to validate the search as consensual, the United States Supreme Court expressed "no opinion as to whether the search at issue here might be justified as consensual." (*Thompson* v. *Louisiana, supra,* 469 U.S. at p. 23 [83 L.Ed.2d at p. 252].)

In the instant case, appellant concedes that the warrantless entry by the police to search for additional victims and suspects and to secure the apartment was lawful and, further, that the officers' observations during the initial sweep are admissible under the plain-view doctrine. However, appellant contends that the remaining evidence, including officer observations after the initial sweep, the physical evidence and the results of the tests performed on the evidence seized, should have been excluded. Respondent contends this evidence was admissible under *People* v. *Hill* (1974) 12 Cal.3d 731, 754-755 [117 Cal.Rptr. 393, 528 P.2d 1], and *People* v. *Amaya* (1979) 93 Cal.App.3d 424, 428 [155 Cal.Rptr. 783].

In *Hill*, the court found that "exigent" circumstances justified an immediate entry and search of the premises where police were dispatched to investigate a recent shooting and they knew that one person suffering from serious wounds had been brought to a hospital. Officers found fresh bloodstains on the fence and porch of the murder site and on an automobile outside. They also observed through a porch window what appeared to be bloodstains on the floor inside of the house. These, and other circumstances, justified the warrantless entry of the residence. The *Hill* court emphasized, however, that the privilege to enter to render aid does not justify a search of the premises for other purposes. (*People* v. *Hill, supra,* 12 Cal.3d 731, 755.) The *Hill* case is inapplicable to the facts before us in that all of the evidence seized in the *Hill* case was in plain sight as the officers walked through the premises and there was no discussion regarding any occurrence of a reentry by the officers or the length of time required to conduct the search.

In *Amaya*, the Third District Court of Appeal upheld the constitutionality of a search and the seizure of items that were within plain view of the police which they could have reasonably believed would aid in the apprehension or conviction of the individuals responsible for the homicide under investigation. The court further held that when the responding officer asserted exclusive police control over the premises by sealing them off, there was, in legal effect, an uninterrupted police presence in the apartment extending from the officer's initial entry through the investigator's second entry in the company of other detectives and that the inspector's reentry and limited search were reasonable under the circumstances. In *Amaya*, a deputy responded to a report of shooting shortly after midnight. Upon arrival he observed a fresh pool of blood in the front of a particular apartment and a trail of blood leading from that apartment to a laundry room around the corner. In the laundry room he found the body of the victim. The deputy entered the apartment and found no one inside but did observe blood on the living room floor and in the bedroom. Approximately 45 minutes later, a homicide inspector arrived at the scene. The deputy advised the inspector that the shooting had occurred inside the apartment. They observed the victim's body

and the surrounding area. About 10 minutes later, the deputy took the inspector inside the apartment. He observed the apartment for approximately two minutes. An hour later, the inspector and other officers reentered the apartment for the purpose of locating evidence which might lead to the identity and apprehension of those responsible for the victim's death. (*People* v. *Amaya, supra,* 93 Cal.App.3d 424, 427.) It was held that the physical withdrawal of the officer from the premises did not terminate what the court considered an uninterrupted police presence in the apartment since the officer immediately asserted exclusive police control over the premises by sealing it off. (*Id.* at p. 431.)

The *Amaya* court specified that the record before it established that "the officers' conduct went no further than the seizure of items which could reasonably result in the identification, apprehension or conviction of the perpetrators and which could have been lawfully seized during the original entry by [the original officer]. Our conclusion herein goes *no further than to find no unreasonable conduct when the police wait a reasonable time for trained personnel before disturbing lawfully seizable evidence at the location of a recent homicide*." (*People* v. *Amaya, supra,* 93 Cal.App.3d 424, 431-432.)[3]

The *Amaya* opinion stands alone in California case law in authorizing reentry on the basis of an uninterrupted control over the premises. *Amaya* relied on *Michigan* v. *Tyler, supra,* 436 U.S. 499, in which the defendants were convicted, inter alia, of conspiring to burn real property. The initial entry into the burning structure by local fire department personnel led to the discovery of plastic containers of flammable liquid. A police detective was summoned to investigate possible arson. He took several photographs but ceased further investigation because of the smoke and steam. Two hours after the original entry by firefighters the fire had been extinguished and the firefighters departed. The fire chief and detective removed the containers of flammable liquid and left. Four hours later the fire chief and his assistant returned for a cursory examination of the building and another hour later the assistant and the detective made another examination and removed pieces of evidence. Three weeks later a member of the state police arson section took photographs at the building and made an inspection which was followed by several other visits, at which time additional evidence and information were obtained. (*Id.* at pp. 501-503 [56 L.Ed.2d at pp. 493-494].) Neither a warrant nor consent for the numerous searches was ever obtained. (*Id.* at p. 504 [56

[3]Then Associate Justice Reynoso dissented from the majority opinion in *Amaya*. A petition for a rehearing was denied although Justice Reynoso was of the opinion that the petition should be granted. Respondent's petition for a rehearing by the Supreme Court was denied. (*People* v. *Amaya, supra,* 93 Cal.App.3d 424, 432-433 (dis. opn. of Reynoso, J.).)

L.Ed.2d at pp. 494-495].) Although the court held that as a general matter official entries to investigate the cause of a fire must adhere to the warrant procedures of the Fourth Amendment (*id.* at p. 509 [56 L.Ed.2d at p. 498]), the firefighters entered the building under exigent circumstances justifying a warrantless entry to fight the fire. (*Id.* at pp. 509-510 [56 L.Ed.2d at pp. 498-499].) The court reasoned that immediate investigation may be necessary to preserve evidence from intentional or accidental destruction and that "the sooner the officials complete their duties, the less will be their subsequent interference with the privacy and the recovery efforts of the victims. For these reasons, officials need no warrant to remain in a building for a reasonable time to investigate the cause of a blaze after it has been extinguished." (*Michigan* v. *Tyler, supra,* 436 U.S. at p. 510 [56 L.Ed.2d at p. 499].) The reentry four hours later was also considered constitutional on the basis that "[l]ittle purpose would have been served by their remaining in the building, except to remove any doubt about the legality of the warrantless search and seizure later that same morning. Under these circumstances, we find that the morning entries were no more than an actual continuation of the first, and the lack of a warrant thus did not invalidate the resulting seizure of evidence." (*Michigan* v. *Tyler, supra,* 436 U.S. at p. 511 [56 L.Ed.2d at p. 499].) Subsequent entries were found to have been clearly detached from the initial exigency and were invalid under the Fourth and Fourteenth Amendments. (*Ibid.*)

*Michigan* v. *Clifford* (1984) 464 U.S. 287 [78 L.Ed.2d 477, 104 S.Ct. 641] involved a warrantless search following reentry of a home six hours after a fire had been extinguished. The United States Supreme Court granted certiorari in that case "to clarify doubt that appears to exist as our application of our decision in *Tyler*." (*Id.* at p. 289 [78 L.Ed.2d at p. 481].) A plurality held that an administrative warrant was indeed required for a nonconsensual reentry onto fire-damaged premises. (*Id.* at pp. 291-292 [78 L.Ed.2d at pp. 482-483].) A warrantless arson investigation in a fire-damaged building, begun six hours after the fire had been extinguished and fire and police officials had left the scene, was not a continuation of an earlier postfire search and therefore violated the Fourth Amendment. The court recognized that "[s]ome fires may be so devastating that no reasonable privacy interests remain in the ash and ruins, regardless of the owner's subjective expectations. The test essentially is an objective one: whether 'the expectation [is] one that society is prepared to recognize as "reasonable." ' *Katz* v. *United States,* 389 U.S. 347, 361 (1967) (conc. opn. of Harlan, J.). Citation omitted. If reasonable privacy interests remain in the fire-damaged property, the warrant requirement applies, and any official entry must be made pursuant to a warrant in the absence of consent or exigent circumstances." (*Michigan* v. *Clifford, supra,* 464 U.S. at pp. 292-293 [78 L.Ed.2d at p. 483].)

"A burning building of course creates an exigency that justifies a warrantless entry by fire officials to fight the blaze. Moreover, in *Tyler* we held that once in the building, officials need no warrant to *remain* for 'a reasonable time to investigate the cause of a blaze after it has been extinguished.' 436 U.S. at 510. Where, however, reasonable expectations of privacy remain in the fire-damaged property, additional investigations begun after the fire has been extinguished and fire and police officials have left the scene, generally must be made pursuant to a warrant or the identification of some new exigency. [¶] The aftermath of a fire often presents exigencies that will not tolerate the delay necessary to obtain a warrant or to secure the owner's consent to inspect fire-damaged premises. Because determining the cause and origin of a fire serves a compelling public interest, the warrant requirement does not apply in such cases." (*Michigan* v. *Clifford, supra,* 464 U.S. at p. 293 [78 L.Ed.2d at pp. 483-484], fns. omitted.)

The court went on to note that the "critical inquiry is whether reasonable expectations of privacy exist in the fire-damaged premises at a particular time, and if so, whether *exigencies* justify the reentries." (*Michigan* v. *Clifford, supra,* 464 U.S. at p. 293, fn. 3 [78 L.Ed.2d at p. 484], italics added.)

In the instant case, Officer Uzzell remained at the apartment some four to five hours after the completion of the initial sweep of the apartment for additional suspects and/or victims. However, after the initial search and removal of the victim and appellant, Officer Uzzell remained outside. No search warrant was ever obtained. The question then is whether Officer Uzzell's conduct was justified by exigent circumstances, and whether, because the apartment had been cordoned off, there was, in essence, no reentry or, at most, it was an actual continuation of the first entry.

In our view, *Amaya* must be distinguished from the instant case. In *Amaya,* approximately 45 minutes elapsed from the time of the initial sweep of the apartment until the homicide inspector arrived at the scene. The victim's body had not been removed. The inspector observed the apartment briefly, left and returned an hour later with other officers and reentered the apartment and conducted a detailed search for evidence of the identity and possible apprehension of the persons responsible for the victim's death. Here, after the initial entry including a sweep of the apartment plus the victim's removal, between four and five hours elapsed before the reentry with investigators. Overall, the search continued for more than 13 hours after the initial entry.

We would also distinguish the instant case from *Tyler* and *Clifford* on the basis that this is strictly a criminal investigation; it was not prompted by a

fire which evolved into a criminal investigation. Investigators were not forced to leave the scene and fire did not threaten to destroy evidence. ■ The constitutionality of a particular search is always a question of reasonableness and depends on a balance between the public interest in the arrest or apprehension of criminals and the individual's right to personal security free from arbitrary interference by law officers. (*United States* v. *Brignoni-Ponce* (1975) 422 U.S. 873, 878 [45 L.Ed.2d 607, 614-615, 95 S.Ct. 2574].) The "Fourth Amendment proscribes all unreasonable searches and seizures, and it is a cardinal principle that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable . . . .' " (*Mincey* v. *Arizona, supra,* 437 U.S. 385, 390 [57 L.Ed.2d 290, 298], quoting *Katz* v. *United States, supra,* 389 U.S. 347, 357 [19 L.Ed.2d 576, 585].) Only a few "specifically established and well-delineated exceptions" (*Katz* v. *United States, supra,* 389 U.S. 347, 357 [19 L.Ed.2d 576, 585]) have been judicially engrafted upon the Fourth Amendment, and the facts of the instant case do not fall within any of them.

■ Thus, we conclude the search of the premises by the investigators after the initial sweep was invalid as unconstitutional under the Fourth and Fourteenth Amendments and any evidence seized or observed after the initial sweep should have been suppressed upon a timely motion to suppress said evidence. Therefore, to that limited extent, we would also conclude appellant was denied effective assistance of counsel for failure to bring a timely suppression motion of any evidence seized after the initial sweep and withdrawal from appellant's apartment.

However, assuming the suppression of the fruits of the warrantless search, it is not reasonably probable that the result in this case would have been more favorable to the appellant. (*Strickland* v. *Washington, supra,* 466 U.S. at p. 694 [80 L.Ed.2d at pp. 697-698]; *People* v. *Fosselman, supra,* 33 Cal.3d at p. 584.) At the time of the initial entry, appellant admitted hitting the victim with a baseball bat. Appellant was found still holding the baseball bat which was covered in blood. Appellant's initial admission, coupled with the testimony concerning the victim's extensive injuries, established appellant's guilt. We must agree with respondent that this evidence is difficult, if not impossible, to overcome. The evidence that the victim was hit a minimum of 13 to 17 times with a blunt instrument such as a baseball bat literally destroyed any credibility that appellant had since appellant initially claimed that he only hit the victim once in an attempt to prevent a robbery.

The only evidence seized from the apartment which should have been suppressed consisted in part of photographs taken of the scene which constituted no more than a memorialization of what the officers observed. The results of the tests performed on hairs seized were inconclusive and added little to the prosecution's case. The size and location of the

bloodstains were observed in plain view by the officer conducting the initial entry; thus, this testimony was properly admitted.

Appellant's admissions, made during his interrogation at the police station, need not have been suppressed in that the evidence with which he was confronted prior to those admissions were those observations of bloodstains, droplets of blood on the tablecloth, the bloody drag mark, the placement of the bucket, the boots and the plastic bag—all objects in plain view observed by the officers upon initial entry onto the scene. However, the results of an investigation conducted by the district attorney's investigators which was initiated after reviewing a photograph of the apartment on December 6, 1988, should have been suppressed. One of the photographs revealed a condom that the police admittedly had not noticed at the scene. Thus, appellant's admission regarding the destruction of that evidence upon advice of counsel would also have been inadmissible. Yet, it is still our conclusion that, in light of the overwhelming evidence that remains admissible, it is not reasonably probable a result more favorable to appellant would have occurred absent the failure to make a motion to suppress evidence of which he complains. Thus, trial counsel's failure to bring a timely suppression motion was harmless error.

The judgment is affirmed but the enhancement for personal use of a deadly weapon is stricken and the abstract of judgment is ordered corrected accordingly. The petition for writ of habeas corpus is denied.

Stone (W. A.), J., and Buckley, J., concurred.

Appellant's petition for review by the Supreme Court was denied October 16, 1991.