[No. G013616. Fourth Dist., Div. Three. June 28, 1994.]

THE PEOPLE, Plaintiff and Respondent, v.
JOHN ANTHONY HIGGINS et al., Defendants and Appellants.

## COUNSEL

Douglas G. Benedon and Brian P. Trela, under appointments by the Court of Appeal, for Defendants and Appellants.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Esteban Hernandez and Warren P. Robinson, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**SONENSHINE, J.**—John Anthony Higgins and Melissa Jill Ayotte pleaded guilty to various narcotics offenses after the trial court denied their Penal Code section 1538.5 motions. We find the motions were properly denied and affirm the judgments.

I

Around 11 o'clock one evening, Officer Green responded to an anonymous report of a domestic disturbance involving "a man shoving a woman around." Green met Officer Grundeman at the residence, and together they knocked on the back door. When no one responded, the officers walked around to the front door. While doing so, Officer Grundeman saw a man inside the residence and heard a shout from within.

The officers knocked on the front door, and after about 30 seconds Ayotte answered. She was breathing heavily and appeared "extremely frightened, . . . afraid, very fidgety, [and] very nervous." She also had a "little red mark" under one eye and slight darkness under both eyes. Based on his experience, Green believed the red mark was caused by Ayotte being struck or slapped in the face.

Green explained why they were there and asked Ayotte if she was all right. Ayotte said she was and explained the red mark was a birthmark.[1] She also said she had fallen down the stairs and the noise from the fall may have prompted someone to call the police. Ayotte had a minor abrasion on her heel she alleged was from the fall. When asked if she was alone, Ayotte said yes but that her boyfriend had been there earlier. During this conversation, Ayotte was trying to edge the officers away from the open door.

Based on her demeanor, Green believed Ayotte was lying. He knew Ayotte was not alone and battered women commonly deny being abused. Green believed Ayotte was the victim of a felony battery[2] and he thought others might have been in peril inside. Green also felt Ayotte may have been under the threat of continued violence.

Accordingly, the officers entered the residence to "make sure everything [was] all right." When they did, Ayotte called upstairs for Higgins, who came down and said he had been sleeping. While talking with Higgins, Green smelled marijuana and saw a triple beam scale on the floor. Near the scale, Green saw a plastic baggie containing marijuana by some newspapers. Green removed the newspapers and found more marijuana and a bindle of cocaine. At this point, Higgins consented to a search of the residence, and the officers found more contraband.[3]

The trial court ruled exigent circumstances justified the officers' warrantless entry and denied appellants' suppression motions. In so doing, the court found Green was highly credible and his actions were properly motivated by legitimate safety concerns. In fact, the court stated the officers would have been derelict in their duty had they taken Ayotte's word she was okay.

---

[1] At the motion hearing, the court said the mark under Ayotte's eye "looks like a long mark, start of a black eye in my estimation."

[2] Penal Code section 273.5, subdivision (a), provides in pertinent part: "[A]ny person who willfully inflicts upon any person of the opposite sex with whom he or she is cohabiting . . . corporal injury resulting in a traumatic condition, is guilty of a felony . . . ." Subdivision (c) of that provision defines "traumatic condition" as "a condition of the body, such as a wound or external or internal injury, whether of a minor or serious nature, caused by a physical force."

"Unlike other felonies, e.g., aggravated battery (§ 243, subd. (d)) which require serious or great bodily injury, 'the Legislature has clothed persons of the opposite sex in intimate relationships with greater protection by requiring less harm to be inflicted before [section 273.5 is violated].' [Citation.]" (*People* v. *Wilkins* (1993) 14 Cal.App.4th 761, 771 [17 Cal.Rptr.2d 743].)

[3] Unbeknownst to the officers, Ayotte and Higgins both had warrants out for their arrest.

## II

██ Appellants disagree. They contend there were no exigent circumstances because Ayotte's perceived injuries were relatively slight and she said she was not hurt. Appellants maintain the officers therefore were required to obtain a warrant before entering the residence.

██ Two steps are involved in deciding whether exigent circumstances existed to justify a warrantless entry: "[F]irst, factual questions as to what the officer knew or believed and what action he [or she] took in response; second, a legal question whether that action was reasonable under the circumstances. [Citation.] On appeal, a reviewing court must affirm the trial court's determinations of the factual questions if they are supported by substantial evidence, but must take the ultimate responsibility for deciding the legal question according to its independent judgment. [Citation.] 'As a general rule, the reasonableness of an officer's conduct is dependent upon the existence of facts available to him [or her] at the moment of the search or seizure which would warrant a man [or woman] of reasonable caution in the belief that the action taken was appropriate. . . .' " (*People* v. *Duncan* (1986) 42 Cal.3d 91, 97-98 [227 Cal.Rptr. 654, 720 P.2d 2].) "There is no ready litmus test for determining whether such circumstances exist, and in each case the claim of an extraordinary situation must be measured by the facts known to the officers. [Citation.]" (*People* v. *Snead* (1991) 1 Cal.App.4th 380, 385 [1 Cal.Rptr.2d 892].)

██ There is substantial evidence to support the trial court's express finding the officers subjectively believed immediate action was needed in this situation. Green testified repeatedly he thought Ayotte's suspicious conduct implied she might have been battered. Green also felt Ayotte was under the threat of continued violence. That the officers did not immediately search the entire residence for potential victims or suspects upon entering does not show bad faith. Higgins appeared from upstairs soon after the officers entered. It was reasonable for the officers to believe he was the prime suspect, since the call described an altercation between a man and a woman.

Furthermore, the record does not support appellants' contention the officers blindly followed their department's domestic disturbance response policy without considering the facts at hand. That policy apparently requires officers to contact all parties at the scene of a suspected domestic disturbance, to ensure everyone is safe and the situation is under control. Green acknowledged this policy. However, he indicated he had discretion to disregard it if the first person he contacted at the scene convinced him everything

was all right. Green said the situation at appellants' residence was "totally different" and Ayotte appeared in danger. This signifies Green carefully assessed the situation and responded based on the circumstances before him. We thus uphold the trial court's finding the officers reasonably believed immediate entrance was necessary.

That the officers' actions were objectively reasonable is also readily apparent when viewed in light of existing case law. ■ In *Welsh* v. *Wisconsin* (1984) 466 U.S. 740 [80 L.Ed.2d 732, 104 S.Ct. 2091], the United States Supreme Court held "that an important factor to be considered when determining whether any exigency exists is the gravity of the underlying offense" suspected by the officers. (*Id.* at p. 753 [80 L.Ed.2d at p. 745].) If the suspected offense is "extremely minor," a warrantless home entry will almost inevitably be unreasonable under the Fourth Amendment. (*Ibid.*)[4] On the other hand, case law recognizes that probable cause of ongoing spousal abuse at a residence warrants immediate police intervention.

For example, in *State* v. *Greene* (1989) 162 Ariz. 341 [784 P.2d 257], the officer entered a residence simply upon seeing the alleged victim of a family dispute at a table inside. There was no evidence the victim was hurt or in imminent danger. Nonetheless, the court sanctioned the warrantless entry under the exigent circumstances exception holding, "[The officer] was dispatched to defendant's residence in response to a 'family fight-domestic violence' call. These calls commonly involve dangerous situations in which the possibility for physical harm or damage escalates rapidly. The immediate presence of the officer is essential. To require an officer to obtain a search warrant before entering a dwelling in response to a domestic violence call would be a meaningless delay that could lead to the occurrence of otherwise preventable violence. [Citation.] The call itself creates a sufficient indication that an exigency exists allowing the officer to enter a dwelling if no circumstance indicates that entry is unnecessary. [Citation.]" (*State* v. *Greene, supra,* 784 P.2d at p. 259.)

*State* v. *Raines* (1989) 55 Wn.App. 459 [778 P.2d 538] also emphasized the need to allow officers flexibility at the scene of a domestic disturbance. There, as here, the suspected victim, Looney, told the police "there was no problem" when they arrived. Looney also denied anyone else was inside, something the officers, like the ones here, knew was false. Suspicious of the situation, the officers entered the residence and an inner room, in which they found Raines hiding and narcotics in plain view.

---

[4]In *Welsh*, the court determined exigency was lacking to effectuate the warrantless home arrest of a driver suspected of driving under the influence, a noncriminal, civil forfeiture offense for which no imprisonment was possible.

In upholding the officers' actions under the exigent circumstances theory, the *Raines* court ruled: "Police officers responding to a domestic violence report have a duty to ensure the present and continued safety and well-being of the occupants. [Citation.] Here, [the officers] had a duty to assure the safety of Looney and [a present] child by ensuring that Raines posed no continuing threat to them. Given the officers' past experience with Looney's efforts to protect Raines, they were not obligated to believe her insistence that no problem existed. In addition, the fact that the occupants appeared to be unharmed when the officers entered did not guarantee that the disturbance had cooled to the point where their continued safety was assured. Until they had an opportunity to observe Raines and talk to him, they had no knowledge of his condition and state of mind. The officers observed a man at the window when they arrived and could reasonably presume it was Raines. Looney was lying to them about his presence. Why? If all was well, why did Raines deliberately attempt to conceal his presence? Why did he not come forward and assure the officers there was no problem requiring their presence? Police officers are entitled to consider such questions in the process of evaluating a given situation. The officers had obvious reasons to be concerned. Courts should be reluctant to rule after the fact that while there were reasons, they were not sufficient." (*State* v. *Raines, supra*, 778 P.2d at pp. 542-543.)

The court also rejected Raines' argument the police should have secured the area and sought a telephonic search warrant before entering the inner room, since neither Looney nor the child were in danger of immediate harm. The court stated such a procedure "would unduly restrict police officers responding to domestic violence incidents in performing their duty to ensure the present and continued safety of the residence's occupants . . . [and] defeat the salutatory purpose of [the state's] domestic violence law." (*State* v. *Raines, supra*, 778 P.2d at p. 543; see also *Commonwealth* v. *Rexach* (1985) 20 Mass.App. 919 [478 N.E.2d 744, 746] [law required officers to " 'use all reasonable means to prevent further abuse' " when responding to domestic disturbances—as long as the officers acted reasonably, they "should not be faulted for choosing one of several alternative ways of performing that duty."].)

California authority is in accord with the views expressed above. In *People* v. *Wilkins* (1993) 14 Cal.App.4th 761 [17 Cal.Rptr.2d 743], the police responded to a domestic violence call and found the victim crying and upset outside the residence. She informed the police her husband, Wilkins, had hit her and requested the officers to enter the residence to arrest him. After they forcibly did so, Wilkins unsuccessfully moved to suppress all evidence obtained as a result of the warrantless entry.

On appeal, the court ruled the officers were not constitutionally con-strained to delay until an arrest warrant could have been obtained: "Given the time of night [around midnight], the securing of a warrant would necessarily have occasioned some delay and during this period the victim would have been vulnerable to further risk of physical harm. The risk of imminent violence resulting in further physical harm to the victim was an exigent circumstance requiring immediate action. [Citations.]" (*People* v. *Wilkins, supra,* 14 Cal.App.4th at p. 772.)

 Such is the case here. The officers had no right to detain Ayotte while seeking a warrant, and based on her actions it is unlikely she would have agreed to stay with the officers during this time. Thus, as in *Wilkins,* the delay in getting a warrant would have subjected Ayotte to further risk of physical harm.[5]

Although not a domestic violence case, *Tamborino* v. *Superior Court* (1986) 41 Cal.3d 919 [226 Cal.Rptr. 868, 719 P.2d 242], is also apt. There, an officer responded to Tamborino's apartment to look for an injured robbery victim. The officer found Tamborino hurt inside but did not know whether he was the robber or a victim. Therefore, the officer took Tambo-rino outside, handcuffed him, and immediately reentered the apartment to search for others. When he did, the officer found narcotics in plain view in the living room.

Recognizing officers are entitled to use "common sense" when responding to perceived emergencies, the Supreme Court upheld the officer's actions based on exigent circumstances. (*Tamborino* v. *Superior Court, supra,* 41 Cal.3d at pp. 923-925.) Importantly, the court refused to second-guess the officer's failure to take a more constitutionally sensitive approach to the situation: "Although unhurried reflection might have led another officer to conclude that Tamborino should have been questioned before even a super-ficial search was conducted, [the officer] could reasonably have concluded that he did not enjoy that luxury, and that immediate action was warrant-ed.[6]" (*Tamborino* v. *Superior Court, supra,* 41 Cal.3d at p. 924; see also *People* v. *Boragno* (1991) 232 Cal.App.3d 378, 386 [283 Cal.Rptr. 452] [Fourth Amend. allows quick warrantless sweep of premises for additional victims or suspects].)

---

[5]We recognize Ayotte's actions stand in marked contrast to the cooperative victim in *Wilkins.* However, this would not likely preclude a finding of probable cause to arrest under Penal Code section 273.5 (see *ante,* fn. 2), given Ayotte's physical appearance, her dishon-esty, and the earlier report of physical violence. Significantly, the statute specifies that even wounds of a minor nature constitute corporal injury.

[6]In a footnote, the Supreme Court quoted federal authority for the proposition, " '. . . the business of police [officers] . . . is to *act,* not to speculate or meditate on whether the report is correct. People could well die in emergencies if the police tried to act with the calm

In this case, the officers were summoned to appellants' residence in response to a report of physical domestic violence. When they contacted Ayotte, she was extremely frightened and appeared to have been the victim of a felony battery. Moreover, Ayotte lied about being alone and gave the officers a suspicious story about having fallen down the stairs. Viewed objectively, these circumstances justified the officers' actions to ensure Ayotte's safety. We cannot say, as a matter of law, that the officers' failure to procure a warrant rendered their actions unconstitutional.

Because the officers' actions were objectively reasonable and motivated by their concern for Ayotte's well being, the trial court correctly found the warrantless entry was proper under the exigent circumstances doctrine.

The judgments are affirmed.

Sills, P. J., and Crosby, J., concurred.

Appellants' petition for review by the Supreme Court was denied October 13, 1994.

---

deliberation associated with the judicial process.' [Citation.]" (*Tamborino* v. *Superior Court*, *supra*, 41 Cal.3d at p. 924, fn. 2, original italics.)