[Crim. No. 23871. First Dist., Div. Two. Mar. 11, 1983.]

THE PEOPLE, Plaintiff and Respondent, v.
RUSSELL ALGER JUSTIN, JR., Defendant and Appellant.

**COUNSEL**

Michael Stepanian and Linda Leavitt for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, William D. Stein, Assistant Attorney General, Ann K.

Jensen and Morris Lenk, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**KLINE, P. J.**—Appellant was convicted, following a plea of nolo contendere, of one count of unlawful possession of cocaine for sale (Health & Saf. Code, § 11351). He appeals, challenging the trial court's denial of his motion to suppress evidence seized upon a search pursuant to warrant. (Pen. Code, § 1538.5.) Appellant contends that the evidence should have been suppressed because the warrant was the product of prior illegal searches. We disagree.

### FACTS

On July 22, 1980, at approximately 3:30 p.m., Officers Melville and Zapian of the Half Moon Bay Police Department were directed to investigate a report of gunshots at 748 LeMans Way in Half Moon Bay. Arriving at that address, the officers encountered appellant outside the residence, barefoot, dressed in pants only, and carrying a gun.

Appellant told the officers that four intruders had entered his house, that he had shot two and their bodies could be found in the hallway, and that the other two were still loose in the house. Appellant attempted to kick open the door to the house to gain entrance for himself and the officers but was unsuccessful. When Officer Zapian suggested that using a key would be easier, appellant immediately produced one, opened the door and followed the two officers into the house. When Officer Zapian indicated he should remain on the front porch, appellant complied. He was not at this time requested to relinquish his weapon. The officers found no evidence of intruders, bodies or blood, but did observe bullet holes in several walls and doors as well as what appeared to be restricted drugs and paraphernalia in plain view in various locations throughout the house. Based upon their training and experience the officers suspected that the items observed were cocaine, marijuana and paraphernalia.

Officer Zapian, believing appellant to have been suffering from anxiety or paranoia and hallucinating, obtained his weapon and determined to detain him for 72-hour psychiatric evaluation (Welf. & Inst. Code, § 5150), noting on the application that he was being referred under circumstances in which criminal charges might be filed. At approximately 3:40 p.m., an ambulance was called to take appellant to the hospital. At the same time, the officers also contacted Detective Ray Hetu via police radio pursuant to departmental policy that he be advised and summoned in cases "involving narcotics or anything of a major

nature." Detective Hetu went to the scene immediately upon being summoned. Upon his arrival the officers briefed him, indicating that their search had revealed no evidence of intruders but that they had made some plain view observations of what they presumed to be narcotics and paraphernalia. Detective Hetu also spoke to appellant who was then sitting in the rear of the ambulance, and heard his version of the incident. He then entered the house and the officers showed him the items in plain view they had earlier observed. Hetu thereupon stationed a police officer and police cadet outside the house to secure the premises.

At approximately 5 p.m., Detective Hetu called Sheriff's Detective Paul Feyling of the San Mateo County Special Investigations Team, briefly described the situation and requested assistance based upon Detective Feyling's more extensive expertise. Detective Feyling arrived about an hour later, was advised in greater detail of what had occurred and shown the various contraband and paraphernalia previously observed by the other officers. He conducted a presumptive test of the white powdery substance, which tested positive for cocaine. After 20 or 30 minutes at the scene Detective Feyling left to obtain a search warrant.

The affidavit for the search warrant was made by Detective Feyling after 10 p.m. the same day. In the affidavit, Feyling stated that Officers Melville and Zapian had told Detective Hetu that they had observed a white powdery substance within a bathroom which they believed to be cocaine and had also observed razor blades, mirrors, scales, baggies and a water pipe in the bathroom. Feyling noted further that Hetu had also observed this material. Relating his own observations, Feyling states that he also observed this material as well as a blowtorch, an "Ohaus Gram" scale, two thick glass squares (purportedly used to mix narcotics), certain packaging materials, a bottle labeled "Sodium Chloride" (purportedly used in the manufacture or "free-basing" of cocaine), another "free-base" cocaine pipe (water pipe), numerous empty bottles, one of which was labeled "Snow-Token Free-Base Solvent," two safes, and a computer and video screen. Based upon these observations and his training and expertise, Detective Feyling concluded that a "clandestine free-base cocaine manufacturing lab" was located in appellant's home.

DISCUSSION

"The Fourth Amendment proscribes all unreasonable searches and seizures, and it is a cardinal principle that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable . . . .' " (*Mincey* v. *Arizona* (1978) 437 U.S. 385, 390 [57 L.Ed.2d 290, 298, 98 S.Ct. 2408].) Only a few "specifically established and well-delineated exceptions" (*Katz* v. *United States* (1967) 389 U.S. 347, 357 [19 L.Ed.2d 576,

585, 88 S.Ct. 507]) have been judicially engrafted upon this general proscription and the counterpart set forth in article I, section 13, of the California Constitution. (*People* v. *Cook* (1978) 22 Cal.3d 67, 97 [148 Cal.Rptr. 605, 583 P.2d 130], quoting *People* v. *Ramey* (1976) 16 Cal.3d 263, 270 [127 Cal.Rptr. 629, 545 P.2d 1333].)

■ The issue whether the confirmatory searches in question were reasonable within the meaning of the Constitution presents a question of law. For this reason we are not bound by the substantial evidence standard in reviewing the trial court's decision; it is rather our responsibility to measure the facts found by the trier against the constitutional standard of reasonableness. (*People* v. *Lawler* (1973) 9 Cal.3d 156, 160 [107 Cal.Rptr. 13, 507 P.2d 621].) In this endeavor we are to exercise our independent judgment. (*People* v. *Leyba* (1981) 29 Cal.3d 591, 596-597 [174 Cal.Rptr. 867, 629 P.2d 961].)

■ The parties agree that the exigent circumstances presented to Officers Zapian and Melville place their entry to the premises within one of the specifically established exceptions to the rule that a warrantless search is per se unreasonable. They sharply differ, however, on the constitutional propriety of the subsequent warrantless entries and confirmatory searches of Detective Hetu and, thereafter, Detective Feyling.

Appellant maintains that the exigent circumstances disappeared prior to appearances on the scene of Detectives Hetu and Feyling. He maintains further that no other exception to the search warrant requirement is available to justify the later entrances to the premises of the two detectives.

Respondent contends that appellant had no reasonable expectation of privacy in light of the invitation to enter he extended to the officers who made the initial entry and the additional fact that the contraband those officers observed was in plain view. ■ Employing the "total police activity" approach utilized by this court in a different context in *In re Vincent B.* (1981) 125 Cal.App.3d 752, 756 [178 Cal.Rptr. 282], respondent urges that the various entries should not each be isolated and separately evaluated, but that all should be conceived as merging into a single intrusion justified by the exigency confronting the officers who first appeared on the scene. ■ On the authority of *People* v. *Superior Court (Hulbert)* (1977) 74 Cal.App.3d 407, 419 [141 Cal.Rptr. 497], respondent also seeks to justify the subsequent entries and searches on the alternative grounds that they were necessary to prevent removal or destruction of incriminating evidence or that if, as appellant concedes, the police could secure the entire premises after the initial search there is no reason the police could not enter during that period.

Respondent's alternative arguments are easily disposed of. There is no evidence whatsoever of danger that evidence would be destroyed or removed pending arrival of the warrant; nor is there any legal authority that police may enter and search premises without a warrant merely because those premises have been secured against entry by others.

The subsequent entries and searches can be sustained under the Fourth Amendment only if appellant can be deemed to have waived his right of privacy and the protection of the Fourth Amendment with respect to the evidence in question, or if the exigency that justified the initial entry can be extended to justify those that followed.

The attempt to characterize the separate entries as merely progressive phases of a single event is defeated by the facts. The most obvious factual difficulty is that the questioned activities of Detective Hetu and Feyling occurred after it had been determined there were no intruders and appellant was disarmed and placed in the ambulance. At that point an emergency was no longer believed to exist and none did exist. Additionally, the purpose for which Officers Zapian and Melville entered the residence—namely, investigation of alleged illegal entries by four intruders and related homicides—was completely different from the purpose of the subsequent entries, which related entirely to the suspected possession by appellant of restricted drugs.

California cases upholding the right of the police to reenter a residence without a warrant in order to observe or seize evidence previously observed during lawful entries are limited to situations in which the initial entry was terminated because the officers were concerned for their safety (*People* v. *Hamilton* (1980) 105 Cal.App.3d 113 [164 Cal.Rptr. 153]; *People* v. *Superior Court* (*Quinn*) (1978) 83 Cal.App.3d 609 [147 Cal.Rptr. 921], or the reentry itself was apparently justified by exigent circumstances to preserve life (*People* v. *Soldoff* (1980) 112 Cal.App.3d 1 [169 Cal.Rptr. 57]), or where no suspect had been apprehended and the reentry was made to seize items the police could reasonably believe would result in the perpetrator's identification and apprehension (*People* v. *Amaya* (1979) 93 Cal.App.3d 424 [155 Cal.Rptr. 783], but see dis. opn. of Reynoso, J.). Such situations are all dissimilar to the one here presented. However, the California cases holding police reentry improper are, in certain key particulars, also distinguishable.

The case relied upon most heavily by appellant is the recent decision in *People* v. *Bradley* (1982) 132 Cal.App.3d 737 [183 Cal.Rptr. 434]. In *Bradley* the police entered the defendant's apartment in the reasonable belief that an intruder was present and a burglary in progress. After gaining entrance the officers found no intruder but observed a stack of $20 bills, pills, hashish, marijuana and a white, granulated material. The officers examined these items, but

left the apartment without seizing anything. One officer secured the apartment by stationing himself outside the front door while the others went elsewhere to call for a search warrant. A deputy district attorney who was unable to obtain a telephone search warrant instructed the officers to contact the narcotics task force. Some 30 minutes later narcotics agent Ashcraft arrived at the scene and reentered the apartment with the officers. Agent Ashcraft examined the items previously observed and conducted a presumptive test on the white, granulated material. Ashcraft then contacted a magistrate for a search warrant, which was refused. Undaunted, Ashcraft returned to the apartment and seized the items, some of which were restricted drugs and paraphernalia.

After finding that the initial entry was due to exigent circumstances and therefore proper, the court held that, even before the unlawful disregard for the magistrate's refusal to issue a search warrant, the first warrantless entry of Agent Ashcraft and his confirmatory investigation were illegal. Once the officers who made the initial entry left the interior of the apartment without removing any item suspected to be related to criminal activity, the court stated, "they were in the same position as though they were possessed of reliable information showing [the] home contained illegal drugs, and they were subject to the same rules of conduct. They were bound to present these facts to a magistrate and obtain a warrant, to obtain consent to enter or reenter because of exigent circumstances." (132 Cal.App.3d at p. 744.) None of these alternative requirements were met. "Given there was no longer an exigency to justify an entry, the reentry of the narcotics force along with the investigating officers violated Bradley's constitutional rights. The apartment was secured and the contraband in no danger of being dissipated. There was nothing to prevent them from continuing efforts to obtain a search warrant through regular affidavit procedures when telephonic procedures proved futile." (*Id.* at p. 746.)

The state case relied upon most heavily in *Bradley* was *People* v. *Frazier* (1977) 71 Cal.App.3d 690 [139 Cal.Rptr. 573]. In *Frazier,* law enforcement officers knocked on the defendant's door and requested entry to investigate a report of screams. After defendant opened the door he appeared to be nervous and inexplicably and hastily retreated to his bedroom. Fearing this conduct indicated there was someone in the bedroom and that there might be a weapon, one of the officers followed defendant in order to protect his own and his partner's safety and that of anyone else in the house. The officers found heroin in plain view on the bed, which they immediately seized, and placed the defendant under arrest and moved him to the living room. After the arrest one of the officers reentered the bedroom and, upon closer inspection, found a cigar box containing marijuana, $2,200 in cash and a hypodermic needle. After holding that the initial entry of the bedroom was proper because the police then had reasonable cause to perceive an immediate threat to their own or a third person's safety, the court found that the marijuana should have been suppressed

because it was not observed when the police were legitimately present in the bedroom. In short, elimination of the exigency immediately eliminated the right of the police to reenter the bedroom without a warrant notwithstanding that the reentry occurred without delay after the arrest, which apparently took place in an adjoining room in the same apartment.

As indicated, the facts of *Bradley* and *Frazier* are distinguishable from those of the instant case in material respects. The most important being that in both cases the person whose premises were entered did not, as in the instant case, propose and facilitate the entry. The invitation to enter extended by defendant to Officers Zapian and Melville has implications regarding the right to privacy not present in *Bradley* and *Frazier*. The *Frazier* case is additionally distinguishable because there the evidence illegally seized during reentry was not in plain view and was not observed during the initial entry.

Appellant also relies upon the 1978 decisions of the United States Supreme Court in *Michigan* v. *Tyler* (1978) 436 U.S. 499 [56 L.Ed.2d 486, 98 S.Ct. 1942] and *Mincey* v. *Arizona* (1978) 437 U.S. 385 [57 L.Ed.2d 290, 98 S.Ct. 2408].

In *Tyler* the court upheld a warrantless search for evidence of arson made several hours after the fire had been extinguished, reasoning that the search was sufficiently related to the initial exigency. The court also held, however, that a search several weeks later was illegal because it occurred long after the emergency had passed. Among other more important factors that will be noted in a moment, the duration of the hiatus between the entries in *Tyler* renders its relevance to the instant case somewhat marginal.

In *Mincey* v. *Arizona, supra,* the Supreme Court invalidated an exhaustive four-day search of a residence which was the scene of a recent homicide. The lower court had validated the search on the theory, rejected by the Supreme Court, that the search of a homicide scene should be expressly recognized as an additional exception to the general rule that warrantless searches are per se unreasonable under the Fourth Amendment. (See *Katz* v. *United States, supra,* 389 U.S. at p. 357 [19 L.Ed.2d at p. 585].) *Mincey,* like *Tyler,* did not involve a situation such as that here presented in which the initial entry was invited and the evidence in question was in plain view.[1]

As the foregoing analysis indicates, we believe the most critical facts in this case are that appellant invited and facilitated the initial entry and that the

---

[1] *Mincey* and *Tyler* do, however, apparently invalidate earlier federal decisions holding that wholly apart from any implied consent, additional investigators may enter a citizen's property after one official has already intruded legally even though the exigent circumstances justifying the initial entry no longer exist. (See, e.g., *United States* v. *Brand* (5th Cir. 1977) 556 F.2d 1312, 1317 and cases there cited.)

evidence observed as a result of that entry, which is sought to be suppressed, was in plain view. These facts are critical because they define the right that may now validly be asserted. In his oft-quoted concurring opinion in the seminal case of *Katz* v. *United States, supra,* Justice Harlan, explaining the majority opinion, states that the protections afforded by the Fourth Amendment are conditioned on a twofold requirement: "first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.' Thus a man's home is, for most purposes, a place where he expects privacy, but objects, activities, or statements that he exposes to the 'plain view' of outsiders are not 'protected' because no intention to keep them to himself has been exhibited." (389 U.S. at p. 361 [19 L.Ed.2d at p. 588].) ■ While the subjective element of the rule articulated in *Katz* has been criticized,[2] and while Justice Harlan has modified his position somewhat with respect thereto (*United States* v. *White* (1971) 401 U.S. 745, 786 [28 L.Ed.2d 453, 478, 91 S.Ct. 1122], dis. opn. of Harlan, J.), the "actual (subjective) expectation of privacy" formulation remains the test for determining whether a person invoking the protection of the Fourth Amendment can properly claim that a "justifiable," a "reasonable" or a "legitimate expectation of privacy" has been impermissibly invaded. (*Smith* v. *Maryland* (1979) 442 U.S. 735, 740 [61 L.Ed.2d 220, 226-227, 99 S.Ct. 2577].)[3] Consonant with *Katz,* the California Supreme Court has held that "in determining whether an illegal search has occurred under the provisions of our Constitution, the appropriate test is whether a person has exhibited a reasonable expectation of privacy and, if so, whether that expectation has been violated by unreasonable governmental intrusion." (*Burrows* v. *Superior Court* (1974) 13 Cal.3d 238, 242-243 [118 Cal.Rptr. 166, 529 P.2d 590].) ■ It has held as well that there is no reasonable expectation of privacy with regard to objects in plain sight from a position to which the observer has been expressly or implicitly invited. (*In re Deborah C.* (1981) 30 Cal.3d 125, 135 [177 Cal.Rptr. 852, 635 P.2d 446]; *Lorenzana* v. *Superior Court* (1973) 9 Cal.3d 626, 634 [108

---

[2]The most insightful critical analysis is Amsterdam, *Perspectives on the Fourth Amendment* (1974) 58 Minn.L.Rev. 349.

[3]The extreme situations in which the court in *Smith* indicates that the subjective approach may not provide an adequate index of Fourth Amendment protection appear to have been identified in response to Professor Amsterdam's comment, in the article cited in the preceding footnote, that if an individual's subjective expectation of privacy can affect his claim to Fourth Amendment protection, ". . . the government could diminish each person's subjective expectation of privacy merely by announcing half-hourly on television that 1984 was being advanced by a decade and that we are all forthwith being placed under comprehensive electronic surveillance." (58 Minn.L.Rev. at p. 384. A similar sentiment is expressed by Justice Mosk in *People* v. *Hyde* (1974) 12 Cal.3d 158, 164, fn. 4 [115 Cal.Rptr. 358, 524 P.2d 830]. This concern is accommodated in *Smith, supra,* 442 U.S. at p. 740, fn. 5 [61 L.Ed.2d at p. 227].) The professor's comment and the response in *Smith* are important but not here relevant. The only conditioning of expectations material in this case relates not to the state's conditioning of appellant's expectations of privacy, but appellant's conditioning of the expectations of the police regarding the putative exigency; which was hardly the concern of Professor Amsterdam or the Supreme Court.

Cal.Rptr. 585, 511 P.2d 33]; *People* v. *Bradley* (1969) 1 Cal.3d 80, 84 [81 Cal.Rptr. 457, 460 P.2d 129].)

In the present case, appellant cannot reasonably be deemed to have exhibited any expectation of privacy with respect to items situated in plain view throughout the house into which he invited the officers who made the initial entry; nor, if he had asserted such an expectation at the trial level, which he did not, could it be recognized as reasonable. Appellant's contention that the waiver of his right to privacy does not extend beyond the initial entry of Officers Zapian and Melville lacks rational foundation in Fourth Amendment jurisprudence. That is, on the facts of this case, judicial invalidation of the subsequent entries and quashing of the warrant would enforce no protection constructed by the Fourth Amendment or its California constitutional counterpart.

It must be emphasized that we do not reach this result because we believe the exigency that assertedly legitimated the initial entry continued in time to legitimate the later entries. Proper understanding of this case lies in the realization that there never was an exigency; or, more accurately, that the "exigency" that existed in the minds of the officers was fabricated by appellant's misrepresentations to the officers who first arrived and which induced them to enter the house with appellant's active assistance. The "exigency," in short, was in the provocative nature of the invitation to enter. Since the invitation represents a waiver of any expectation of privacy with respect to evidence exposed to the plain view of the invitees, the protection of the Fourth Amendment does not here operate.

Depriving appellant of Fourth Amendment protection will not, it deserves to be noted, encourage law enforcement officers to make a general practice of conducting warrantless confirmatory searches in the future. In *People* v. *Cook, supra,* 22 Cal.3d 67, in which the salutary deterrent effect of the exclusionary rule on illegal police practices is properly emphasized, as in virtually every appellate case otherwise pertinent to the one at hand, the owner of the premises did not even impliedly consent nor certainly, as in this case, actively encourage the initial governmental intrusion.[4] *Cook* and all the other cases herein discussed do not, in other words, present the waiver of the right of privacy here manifest. The "search-unlawfully-first-obtain-the-warrant-later procedure"

---

[4]But see *People* v. *Garcia* (1982) 139 Cal.App.3d Supp. 1 [188 Cal.Rptr. 868] involving reentry for purpose of arrest. We are unpersuaded by the reasoning of the superior court in that case, first, because it entirely ignores the connection between the implied consent to the initial entry and the defendant's expectation of privacy and, second, because it heavily and we believe improperly relies upon *People* v. *Bradley, supra,* 132 Cal.App.3d 737, and *People* v. *Frazier, supra,* 71 Cal.App.3d 690, cases in which there was no implied consent and therefore no waiver of Fourth Amendment protection.

condemned in *Cook* because it would "totally undermine the purposes of the exclusionary rule" (22 Cal.3d at p. 95, quoting the dis. opn. of Peters, J. in *Krauss* v. *Superior Court* (1971) 5 Cal.3d 418, 426 [96 Cal.Rptr. 455, 487 P.2d 1023]), does not describe the conduct of the police in this case. The delay in obtaining the warrant was not occasioned by any invidious purpose, as in *Cook* and *People* v. *Bradley, supra,* 132 Cal.App.3d 737, but out of an excess of caution.[5]

Moreover, the delay in securing the warrant was brief, the observations of the detectives who made the subsequent entries were limited to the plain view observations of the officers who initially entered (see *Walter* v. *United States* (1980) 447 U.S. 649 [65 L.Ed.2d 410, 100 S.Ct. 2395]) and, from all that appears in the record, the later entries did not result in the police eventually obtaining any evidence that could not have been (and would unquestionably better have been) immediately seized upon the initial entry.

For the foregoing reasons, the order appealed from is affirmed.

Miller, J., and Smith, J., concurred.

A petition for a rehearing was denied April 5, 1983, and on April 12, 1983, the opinion was modified to read as printed above.

---

[5]The reason the officers who made the initial entry did not immediately seize the evidence or seek a warrant was explained as follows by Officer Zapian at the preliminary hearing: "It is a policy with our department, generally, where we are involved in a . . . situation involving narcotics or anything of a major nature that the detective be advised of the situation and summoned to the scene if necessary."

Officers Zapian and Melville and Detective Hetu all belong to the Half Moon Bay Police Department, which consisted entirely of a chief, one detective, two sergeants and six patrolmen. There are indications in the record that all three lacked extensive experience in narcotics investigations and for this reason and due to a "lack of manpower" regularly sought and obtained the assistance of narcotics specialists from the Special Investigations Team of the San Mateo County Sheriff's Department, such as Detective Feyling, in connection with serious narcotics cases.