[No. B233816. Second Dist., Div. Eight. Mar. 29, 2012.]

THE PEOPLE, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
CARL EDWARD CHAPMAN, Real Party in Interest.

COUNSEL.

Steve Cooley, District Attorney, Roberta Schwartz and Tracey Lopez, Deputy District Attorneys, for Petitioner.

No appearance for Respondent.

Robert Sheahen and Kelly Sheahen Gerner for Real Party in Interest.

OPINION

FLIER, J.—

## INTRODUCTION

In this murder case, the People challenge an order granting defendant's motion to suppress forensic evidence seized from his home pursuant to a warrantless search conducted after he was arrested and the victim was declared dead. Concluding there was no exigency or consent justifying the warrantless reentry of officers after the arrest and declaration of death, the trial court suppressed such evidence, and the observations of those who gathered it. We conclude the trial court erred and grant, in part, the People's petition for writ of mandate.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. *Summary of Events Prior to Chapman Being Charged*

At 5:05 p.m. on March 2, 2007, police officers arrived at the residence of Carl Edward Chapman in response to a call that shots had been fired in his house. A crowd of neighbors had gathered outside of the house. They were yelling that there was somebody shooting inside the house. The police gang unit arrived almost simultaneously and began getting ready to go inside the house.

Chapman was ordered out of the house, and he came out with his girlfriend, Raquel Perry. Chapman was placed in handcuffs almost immediately, and a patdown search revealed a loaded pistol magazine in his pocket with .22-caliber rounds. During the patdown search, Perry, who was screaming hysterically, said, "Help us, he shot him, he shot him," pointing to Chapman. During the patdown, in response to whether he had any weapons, Chapman kept saying, "Just help him. Help him," referring to his adult son Brian Chapman in the house.

Between two to 10 minutes after they arrived, officers conducted a protective sweep to search for suspects or victims who needed aid. It took these officers about five minutes to complete the sweep. The officers fanned out from the living room into the bedrooms and kitchen area to look for the victim or any suspects. Brian Chapman's body was found on the floor near the kitchen and laundry rooms. He had been shot and had a sledgehammer

next to him. During the sweep, officers observed shell casings on the ground in the kitchen area, bullet holes in the walls, and blood, but did not disturb anything. Paramedics, who had already arrived at the scene, were allowed to enter the house as soon as the protective sweep was over. One of the officers (Officer Lopez) secured the premises by remaining with the body in the house until the coroner arrived much later.

Chapman, who was in one of the police vehicles, was transported to the police station about 5:25 p.m. About 5:45 p.m., two detectives (Porche and Phillips) arrived at the scene and were briefed by the officers standing outside the residence. Porche was advised that a shooting had occurred and a dead body was lying in the house, that Chapman was in custody, and that there were no other victims or suspects in the house.

As a result, Detectives Porche and Phillips immediately entered with one of the officers who had conducted the protective sweep. The officer walked the detectives through the scene. Porche saw a shell casing from a handgun in the kitchen area, strike marks on the wall or refrigerator, a handgun on the floor in the kitchen, and a dead body on the threshold between the kitchen and laundry areas. The handgun was on the kitchen floor about two feet from the body. All of these items were unobstructed and in plain view. The walkthrough took about 30 to 40 minutes. No evidence was disturbed or seized.

About 7:20 p.m., Detective Umansky arrived and walked around outside the residence. Umansky talked with the officers who had conducted the protective sweep, and they told him there had been a shooting in the house, that they had gone through the entire house and had seen bullet holes, a gun, blood in the room where the body was found, and a sledge hammer during the sweep. Umansky entered the house at 7:30 p.m. with Detective Phillips and observed the crime scene, including Brian's body, the gun, a shell casing and several bullet fragments, bullet holes, including a bullet hole in the refrigerator door, and blood on the walls of the kitchen and laundry rooms, as well as blood spots on the kitchen floor, all of which were unobstructed and in plain view.

The photographer arrived at 6:50 p.m., while criminalists arrived about 7:20 p.m. Detective Umansky left at 8:40 p.m. to interview Chapman at the police station. Three more criminalists arrived between 9:30 p.m. and 9:55 p.m. The coroner's investigator arrived at 12:35 p.m. When the coroner moved the body, a shell casing was uncovered from beneath it. Also beneath

the body was a "divot" or depression in the floor from a possible bullet strike. A casting was taken of the depression after the pooled blood that was underneath the body had been cleaned up. The coroner left the scene at 2:15 a.m.

Chapman confessed to shooting his son four times during his interview with Detective Umansky. After finishing his interview with Chapman at 12:30 a.m., Umansky went back to the house to search Chapman's car because he told the detective there was another gun in the car. While there was nothing in the car, Umansky discovered another bullet fragment inside the refrigerator. Umansky later testified he did not get a search warrant because everything was in plain view.[1] Umansky left the scene about a half-hour after the coroner.

### 2. *Trial Court Proceedings*

Chapman was charged with murder, along with a personal gun use allegation (Pen. Code, former § 12022.53, subds. (b)–(d)). Conceding the entry of officers who conducted the protective sweep was valid based upon exigent circumstances and consent, Chapman moved to suppress all of the evidence observed or seized at his house by the police responders who arrived after 5:30 p.m. Chapman argued that while officers lawfully entered the house in response to an emergency, that emergency dissipated at 5:22 p.m., when Brian was pronounced dead and by 5:25 p.m., when Chapman was taken into custody, thereby necessitating a search warrant for a further entry and search. The People opposed the motion, arguing they did not need a search warrant because of exigent circumstances and Chapman's consent to enter the house. In addition, the bulk of the evidence was observed in plain view, and the evidence that was not in plain view would have inevitably been discovered by legal means anyway.

The trial court granted Chapman's motion, in part. The court concluded that all evidence observed during the "first wave" of responders (i.e., the police officers who conducted the protective sweep and the paramedics) was admissible because they were legitimately in the house due to exigent circumstances. Also *not* suppressed was the victim's body, including the autopsy results and a bullet fragment taken from the victim's brain, as well as photographs of the body taken at the scene by the coroners.

---

[1] Umansky testified that the items discovered that were *not* in plain view were (1) a shell casing found beneath Brian's body after it was removed by the coroner, (2) a depression in the floor beneath the body (indicating a gunshot), and (3) the bullet fragment *inside* the refrigerator.

The trial court found the emergency ended before the "second wave" entered the house. Chapman was arrested and the premises were secured, said the court. The second wave of officers was designed to follow up and not deal with the exigent circumstances. Rather, their purpose was to investigate and determine if there was a crime and who was involved. The court ordered the evidence observed or seized by the "second wave" of responders (the detectives and criminalists, except the observations by the coroner) was to be suppressed because any exigency ended after Brian died and Chapman was in custody.

On the issue of consent, the trial court concluded, "The statement of Mr. Chapman goes beyond help and goes beyond him. It says, 'Just help him.' It is, as far as I'm concerned, a limited consent to enter for the purpose at hand. . . . [R]egrettably, there was no one to help because it was clear that Brian Chapman was deceased. [¶] . . . [¶] But here, there was express consent. There was express concern to undertake the original entry, but it was limited and it did not extend beyond that. It was demonstrated by conduct and words, and the words and conduct were limited. It extended, as far as I am concerned, no further than the initial wave of officers."

There were other proceedings concerning Chapman's motion to exclude his confession under *Miranda*,[2] which are not relevant to this writ petition. But the People later dismissed the case and immediately refiled it under a new number. Chapman again filed the same suppression motion, which the People opposed. On May 20, 2011, the same judge once again granted the motion in part, making the same finding and conclusions as before. The judge incorporated his prior ruling as part of the new ruling.

The trial court continued the hearing to determine whether any statement made by Chapman during his interview with Detective Umansky should be excluded under the Fourth Amendment as tainted "fruit of the poisonous tree" based on questions Umansky asked relating to his own observation of the evidence (which the court had just suppressed) rather than observations of the first wave responders. (See *People v. Williams* (1988) 45 Cal.3d 1268, 1299–1300 [248 Cal.Rptr. 834, 756 P.2d 221] (*Williams*) [exclusionary rule requires suppression of evidence derived from unlawful conduct].) On May 23, 2011, the court denied this aspect of Chapman's suppression motion, with the exception of any statements he made concerning bloodstains in a bedroom and a bullet hole in the dining room wall.

## 3. *The People's Writ Petition*

The People timely filed a writ petition challenging the trial court's suppression rulings of May 20 and 23, 2011. We stayed the pending trial,

---

[2] *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602].

issued an alternative writ of mandate, and requested further briefing. The People argue the trial court erred in suppressing the observations and seizure of evidence by the second wave responders because all of the evidence was either in plain view or subject to inevitable discovery. The People also challenge the trial court's order suppressing Chapman's responses to questions that were based upon Detective Umansky's observations of bloodstains in a bedroom and a bullet hole in the dining room wall.

## DISCUSSION

### 1. *Standard of Review*

The standard of review on a motion to suppress is well established. The appellate court views the record in the light most favorable to the ruling and defers to the trial court's factual findings, express or implied, when supported by substantial evidence. But in determining whether, on the facts so found, the search or seizure was reasonable under the Fourth Amendment, the appellate court exercises its independent judgment. (*In re Rudy F.* (2004) 117 Cal.App.4th 1124, 1130 [12 Cal.Rptr.3d 483]; see *Williams, supra,* 45 Cal.3d at p. 1301.) Appellate review is confined to the correctness or incorrectness of the trial court's ruling, not the reasons for its ruling. (*People v. Baker* (2008) 164 Cal.App.4th 1152, 1156 [79 Cal.Rptr.3d 858].)

### 2. *Summary of Fourth Amendment Principles*

■ The Fourth Amendment prohibits only those searches and seizures that are unreasonable. (*Florida v. Jimeno* (1991) 500 U.S. 248, 250 [114 L.Ed.2d 297, 111 S.Ct. 1801]; see also *Brigham City v. Stuart* (2006) 547 U.S. 398, 403 [164 L.Ed.2d 650, 126 S.Ct. 1943] ["the ultimate touchstone of the Fourth Amendment is 'reasonableness' . . ."].) While a search conducted without a warrant is per se unreasonable under the Fourth Amendment, one of the established exceptions to the warrant requirement is when the entry and search is based upon exigent circumstances. (See *Mincey v. Arizona* (1978) 437 U.S. 385, 390–391 [57 L.Ed.2d 290, 98 S.Ct. 2408] (*Mincey*).) An exigent circumstance is "an emergency situation requiring swift action to prevent imminent danger to life or serious damage to property, or to forestall the imminent escape of a suspect or destruction of evidence." (*People v. Ramey* (1976) 16 Cal.3d 263, 276 [127 Cal.Rptr. 629, 545 P.2d 1333]; see also *Stuart, supra,* at p. 403; *People v. Duncan* (1986) 42 Cal.3d 91, 99 [227 Cal.Rptr. 654, 720 P.2d 2] (*Duncan*) ["a search or seizure based on exigent circumstances ends when the emergency passes"].)

■ Another established exception to the warrant requirement is when consent is given by one authorized to give it. (*Schneckloth v. Bustamonte*

(1973) 412 U.S. 218, 219 [36 L.Ed.2d 854, 93 S.Ct. 2041]; *People v. Leib* (1976) 16 Cal.3d 869, 873 [129 Cal.Rptr. 433, 548 P.2d 1105].) By consenting to a warrantless search, one waives the right protected by the Fourth Amendment. (*People v. Harwood* (1977) 74 Cal.App.3d 460, 465 [141 Cal.Rptr. 519]; see also *Blair v. Pitchess* (1971) 5 Cal.3d 258, 274 [96 Cal.Rptr. 42, 486 P.2d 1242]; *U.S. v. Rubio* (9th Cir. 1983) 727 F.2d 786, 797 ["Once consent has been obtained from one with authority to give it, any expectation of privacy has been lost."].)

A consensual search may not exceed the scope of the consent given. (*People v. Harwood, supra,* 74 Cal.App.3d at p. 468 [consent to search for specific items does not include the right to intercept telephone calls to the premises]; *People v. Superior Court (Arketa)* (1970) 10 Cal.App.3d 122, 127 [89 Cal.Rptr. 316] [consent to enter house to search for burglar suspects did not extend to search of closets to uncover crowbar]; see also *People v. Cantor* (2007) 149 Cal.App.4th 961, 965 [57 Cal.Rptr.3d 478] [search exceeded consent to " 'check' " vehicle " 'real quick' " where officer thoroughly searched vehicle, including trunk, under hood, and in interior several times for 15 minutes and did not find anything, but later found drugs after looking in trunk a second time and opening a container within another container].)

Also, consent to enter and search may be express or implied, and may be demonstrated by conduct as well as words. (*People v. Frye* (1998) 18 Cal.4th 894, 990 [77 Cal.Rptr.2d 25, 959 P.2d 183], disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22 [87 Cal.Rptr.3d 209, 198 P.3d 11]; *People v. Superior Court (Henry)* (1974) 41 Cal.App.3d 636, 639 [116 Cal.Rptr. 24]; *People v. Wright* (1957) 153 Cal.App.2d 35, 40–41 [313 P.2d 868] [defendant waived an objection to warrantless seizure of contraband when he invited officers to enter house and led them to room containing items]; see also *People v. Nelson* (1985) 166 Cal.App.3d 1209, 1215 [212 Cal.Rptr. 799] [a person's internal state of mind is not relevant on the issue of consent because it is the saying of the words of consent that is relevant].) Consequently, inviting police to respond to an emergency may, depending upon the circumstances, be regarded as implied consent to enter and search for suspects and victims. (See *People v. Justin* (1983) 140 Cal.App.3d 729, 733, 738–740 [189 Cal.Rptr. 662] (*Justin*); see also *People v. Timms* (1986) 179 Cal.App.3d 86, 92 [224 Cal.Rptr. 434].)

▮ Furthermore, whether a lawful entry and search is based upon exigent circumstances or consent, the law is clear that any incriminating evidence observed in plain view may be seized. (See *Coolidge v. New Hampshire* (1971) 403 U.S. 443, 465 [29 L.Ed.2d 564, 91 S.Ct. 2022]; see also *Horton v. California* (1990) 496 U.S. 128, 133–137 [110 L.Ed.2d 112, 110 S.Ct. 2301] (*Horton*).) The United States Supreme Court has said, "The plain-view

doctrine authorizes seizure of illegal or evidentiary items visible to a police officer whose access to the object has some prior Fourth Amendment justification and who has probable cause to suspect that the item is connected with criminal activity. [Citations.] The plain-view doctrine is grounded on the proposition that once police are lawfully in a position to observe an item first-hand, its owner's privacy interest in that item is lost; the owner may retain the incidents of title and possession but not privacy." (*Illinois v. Andreas* (1983) 463 U.S. 765, 771 [77 L.Ed.2d 1003, 103 S.Ct. 3319]; see also *Katz v. United States* (1967) 389 U.S. 347, 351 [19 L.Ed.2d 576, 88 S.Ct. 507] ["What a person knowingly exposes to the public, even in his own home . . . is not . . . subject [to] Fourth Amendment protection"].)

In *Payton v. New York* (1980) 445 U.S. 573 [63 L.Ed.2d 639, 100 S.Ct. 1371], the court noted that "[t]he seizure of property in plain view involves no invasion of privacy and is presumptively reasonable, assuming that there is probable cause to associate the property with criminal activity." (*Id.* at p. 587.) Police officers may seize incriminating evidence in plain view during the course of a lawful search because such a seizure "does not involve an intrusion on privacy. If the interest in privacy has been invaded, the violation must have occurred before the object came into plain view . . . ." (*Horton, supra,* 496 U.S. at p. 141, fn. omitted.) The justification for the doctrine is "the desirability of sparing police, whose viewing of the object in the course of a lawful search is as legitimate as it would have been in a public place, the inconvenience and the risk—to themselves or to preservation of the evidence—of going to obtain a warrant." (*Arizona v. Hicks* (1987) 480 U.S. 321, 327 [94 L.Ed.2d 347, 107 S.Ct. 1149].) Also, the doctrine "reflects the fact that requiring police to obtain a warrant once they have obtained a first-hand perception of contraband, stolen property, or incriminating evidence generally would be a 'needless inconvenience,' [citation], that might involve danger to the police and public." (*Texas v. Brown* (1983) 460 U.S. 730, 739 [75 L.Ed.2d 502, 103 S.Ct. 1535].)

Based upon these principles, the trial court properly concluded the entry, search and observations of the first wave responders were appropriate and met constitutional standards. Indeed, the parties do not dispute the first wave responders properly entered the house without a warrant based upon exigent circumstances and Chapman's consent. Therefore, their observations of evidence in plain view are properly admissible because they were validly in the home and any privacy interest in those items was lost. What the parties dispute, and the fundamental issue in this case, is whether the warrantless entry by the second wave responders was proper and thus whether their observations and seizure of the plain-view evidence were improperly suppressed. As discussed below, we believe the plain-view evidence was erroneously suppressed.

### 3. *The Trial Court Erred in Suppressing the Bulk of the Evidence Collected by the Second Wave Responders*

Generally, an independent justification is required for every warrantless entry by police, including those instances when the officers initially enter a residence lawfully but depart the premises and reenter later. (*Justin, supra*, 140 Cal.App.3d at p. 736 [subsequent entries valid only if defendant waived his privacy rights or the exigency that justified the initial entry can be extended to justify those that followed]; see also *People v. Boragno* (1991) 232 Cal.App.3d 378, 386 [283 Cal.Rptr. 452] (*Boragno*) ["no sufficient exigent circumstances to justify the second warrantless entry and seizure" as initial emergency had dissipated]; *People v. Bradley* (1982) 132 Cal.App.3d 737, 744 [183 Cal.Rptr. 434] [the court held the defendant regained his right to privacy when the initial emergency passed and police had left, and suppressed the evidence seized during a subsequent reentry].)

But California decisions uphold an officer's reentry to seize evidence observed in plain view during a lawful entry but not seized initially because the officer was performing a duty that took priority over the seizure of evidence. For example, in *People v. McDowell* (1988) 46 Cal.3d 551, 564 [250 Cal.Rptr. 530, 758 P.2d 1060, 763 P.2d 1269] (*McDowell*), an officer reentered a residence to retrieve evidence observed in plain view while pursuing a murder suspect. The court explained: "[The officer's] initial entry revealed evidence in plain view. His departure occurred before the items were seized because his first priority was the search for the suspect who was still at large. As he left, however, [he] secured the house by instructing another officer to assure that no one entered. 'Thus his physical withdrawal from the [house] did not terminate what was in legal effect an uninterrupted police presence in [the residence] . . . .' [Citation.] We do not believe [the officer] relinquished his right to seize this evidence by giving more immediate priority to defendant's arrest. We therefore conclude that [his] actions, under the particular circumstances of this case, were reasonable." (*Ibid.*; see also *People v. Amaya* (1979) 93 Cal.App.3d 424, 431 [155 Cal.Rptr. 783] [the court upheld reentry of detectives to observe and collect evidence observed in plain view about two hours earlier by the first responding officer because there was effectively an uninterrupted police presence at the residence, the officer could have seized the evidence during the original entry, and it was not unreasonable for police to wait a reasonable time for trained personnel before disturbing lawfully seizable evidence].)

In *People v. Ngaue* (1992) 8 Cal.App.4th 896, 901–902 [10 Cal.Rptr.2d 521], the court upheld a police reentry into a residence to retrieve a gun seen in plain view when arresting the occupant. The occupant promptly escaped from custody, and the arresting officer turned his attention to containing the

area in order to apprehend him, but later called another officer and instructed him to return to the house to retrieve the gun. The appellate court held that the reentry was constitutionally valid under *McDowell* because "there was no intent on the part of the officers to abandon the gun and retrieval of the gun took place without inexcusable delay." (*Ngaue, supra,* at p. 905.)

In an analogous case—*Justin, supra,* 140 Cal.App.3d 729—the court recognized a right of reentry involving the observation or seizure of plain-view evidence previously observed during a lawful entry that was based upon the defendant's implied consent. (*Id.* at p. 736.) Officers were directed to investigate a report of gunshots in a residence about 3:30 p.m. The defendant told the officers he had shot intruders in the house and let the officers in the residence. The officers did not find any intruders or blood, but did see bullet holes in several walls and doors as well as restricted drugs and paraphernalia in plain view in various locations throughout the house. At 3:40 p.m., a detective was summoned pursuant to departmental policy and he arrived immediately at the scene. After the detective was briefed of the officers' plain-view observations, they reentered the house and the officers showed the detective the items in plain view. The detective had an officer secure the residence and at 5:00 p.m. summoned a county investigator, who arrived an hour later. The investigator was advised of what had occurred and shown the contraband previously observed by the other officers. He conducted a test, which was positive for cocaine. After 20 or 30 minutes at the scene, the investigator left to obtain a search warrant. (*Id.* at pp. 733–734.)

On appeal, the issue was whether the subsequent entries and searches were illegal. The court concluded the defendant's invitation to enter the house was a waiver of the defendant's right to privacy in items the officers observed in plain view. The court said: "[W]e believe the most critical facts in this case are that [defendant] invited and facilitated the initial entry and that the evidence observed as a result of that entry, which is sought to be suppressed, was in plain view." (*Justin, supra,* 140 Cal.App.3d at pp. 738–739.) The court further held that the defendant's waiver of his right to privacy extended beyond the initial entry to the subsequent entries: "[Defendant] cannot reasonably be deemed to have exhibited any expectation of privacy with respect to items situated in plain view throughout the house into which he invited the officers who made the initial entry . . . . [Defendant's] contention that the waiver of his right to privacy does not extend beyond the initial entry of [the two officers] lacks rational foundation in Fourth Amendment jurisprudence. That is, on the facts of this case, judicial invalidation of the subsequent entries and quashing of the warrant would enforce no protection constructed by the Fourth Amendment or its California constitutional counterpart." (*Id.* at p. 740.)

■ These decisions indicate that the uninterrupted stream of second wave responders—which began with Detectives Porche and Phillips (led by one of the officers who was part of the protective sweep) just 25 minutes after the officers finished their protective sweep—was entitled to enter Chapman's residence to process and seize the evidence observed in plain view just minutes earlier. The concern of the first wave responders that gave rise to the protective sweep—the search for shooting victims and suspects, and to give aid to any victim—took priority over seizure of evidence observed in plain view during the course of that sweep. Requiring the first wave responders to seize evidence found in plain view during their search would have hampered their primary duty and could have made what appeared to be a dangerous situation even more dangerous.

Just as in *McDowell*, there is no indication of any intent by the first wave responders to abandon their right to seize the incriminating plain-view evidence by leaving the residence. To the contrary, these officers immediately secured the residence after completing the sweep by leaving Officer Lopez inside next to the body *the entire time*. Detectives then promptly entered to confirm the evidence that had been observed, followed by a photographer and criminalists who processed and seized it.

Even more so than in *McDowell*, in this case there was an *actual* uninterrupted police presence in the residence justifying the warrantless seizure of plain-view evidence by the second wave responders begun shortly after the initial entry. (See *People v. Plane* (1969) 274 Cal.App.2d 1, 5 [78 Cal.Rptr. 528] [explaining that when an officer called a sergeant to an apartment after seeing a suspected marijuana plant in plain view the "latter's appearance on the scene did not amount to an entry by the police—Officer Kitchen was already there"]; see also *Duncan, supra,* 42 Cal.3d at p. 99 [where initial officer's entry was justified and, after suspecting drug activity seen in plain view, he called for a supervisor, the court concluded "[t]he second officer's entry went no further than that of the first officer, and was meant only to interpret what the first officer had already seen. The second officer's entry was thus a minimal additional intrusion on the defendant's privacy."].)

Also, just as in *Justin*, Chapman invited the first wave responders into his residence and he therefore lost any expectation of privacy as to items observed in plain view during the search, which was within the scope of his consent, including the bullet holes in the walls, shell casings, bullet fragments, the gun, the sledge hammer, Brian's body, and the surrounding blood. The entry of the second wave responders to further observe, photograph, and collect this plain-view evidence began within minutes and was reasonable under the circumstances. As in *Justin*, we believe Chapman's "contention that

the waiver of his right to privacy does not extend beyond the initial entry of [the first wave responders] lacks rational foundation in Fourth Amendment jurisprudence." (*Justin, supra,* 140 Cal.App.3d at p. 740.) The search and seizure of plain-view evidence by the second wave responders did not significantly add to the invasion of privacy caused by the initial, authorized search. Once Chapman's privacy was lawfully invaded by his consent and with the exigent circumstances, he lost privacy interests in items observed in plain view. A close-in-time successive search of the areas already searched in order to begin processing and collecting this evidence does not constitute an unreasonable and additional invasion of privacy, and therefore does not violate the Fourth Amendment. (See *Horton, supra,* 496 U.S. at p. 141.)

Our conclusion in this case is further supported by courts of many other jurisdictions that have upheld under the Fourth Amendment the warrantless reentry of a home in order to retrieve plain-view evidence previously observed during a valid and proximate entry and search.[3] (See, e.g., *State v. Magnano* (1987) 204 Conn. 259 [528 A.2d 760, 764] ["when a law enforcement officer enters private premises in response to a call for help, and during the course of responding to the emergency observes but does not take into custody evidence in plain view, a subsequent entry shortly thereafter, by detectives whose duty it is to process evidence, constitutes a mere continuation of the original entry"]; *State v. Bell* (1987) 108 Wn.2d 193 [737 P.2d 254, 259] ["[o]nce the privacy of the residence has been lawfully invaded, it is senseless to require a warrant for others to enter and complete what those already on the scene would be justified in doing"]; *Wengert v. State* (2001) 364 Md. 76 [771 A.2d 389, 399] ["when law enforcement officers enter a residence [lawfully] and . . . come upon evidence in 'plain view,' but do not immediately take it into custody, a subsequent entry shortly thereafter by officers who arrive to assist in the evidence processing and seizure constitutes a mere continuation of the initial entry and does not require a warrant"]; accord, *Harris v. Ford* (10th Cir. 2010) 369 Fed.Appx. 881, 888 [court refused to find unlawful the warrantless reentry of an officer to photograph and seize contraband he had moments before observed in plain view during a lawful entry in search of injured persons]; *United States v. Oaxaca* (9th Cir. 1978) 569 F.2d 518, 522 [court upheld a warrantless reentry to seize contraband—stolen money—observed in plain view while arresting the defendant during the initial "hot pursuit" entry]; *United States v. Green* (5th Cir. 1973) 474 F.2d 1385, 1390 [court upheld warrantless entry of secret service agent to observe and take custody of evidence of counterfeiting observed by fire marshal during an arson investigation, stating, "Once the

---

[3] We may properly look to other jurisdictions for guidance with regard to the issues presented in this case. (See *People v. Valencia* (2011) 201 Cal.App.4th 922, 932 [136 Cal.Rptr.3d 25]; *United Parcel Service Wage & Hour Cases* (2011) 196 Cal.App.4th 57, 63 [125 Cal.Rptr.3d 384] [unpublished federal district court cases are citable as persuasive authority].)

privacy of a dwelling has been lawfully invaded, to require a second officer from another law enforcement agency arriving on the scene of a valid seizure to secure a warrant before he enters the premises to confirm that the seized evidence is contraband and to take custody of it is just as senseless as requiring an officer to interrupt a lawful search to stop and procure a warrant for evidence he has already inadvertently found and seized."]; *U.S. v. Hill* (D.Minn., Mar. 31, 2011, 11-CR-0015 (DWF/LIB)) 2011 U.S.Dist. Lexis 42410 [court upheld a warrantless reentry to photograph bloodstains in a house that were observed in plain view by officers during a prior entry to which the defendant had given his consent]; *United States v. Roberts* (5th Cir. 1980) 619 F.2d 379, 381 [court upheld warrantless entry of federal officers called by state officers to residence in order to seize contraband after the state officers discovered this evidence in plain view during their initial lawful entry]; *United States v. Herndon* (S.D.Fla. 1975) 390 F.Supp. 1017, 1021–1022 [the justification for upholding the warrantless entry of federal agents into a home and nearby barn to investigate the operation of an illegal "still" observed earlier in plain view by county officers who were lawfully searching for victims of a shooting incident was the fact the entry and search of the federal agents did not significantly add to the invasion of privacy created by the initial search]; *Mazen v. Seidel* (1997) 189 Ariz. 195 [940 P.2d 923, 927–928] [court upheld warrantless entry of officers into a storage unit to observe marijuana plants seen by fireman while putting out a fire, and also upheld a later warrantless entry and seizure of the plants (and bags of marijuana) by drug enforcement detectives summoned by the initial officers, noting that the delay in seizure due to the later arrival of the detectives was not determinative because during that time the defendant did not regain his expectation of privacy]; *Wofford v. State* (1997) 330 Ark. 8 [952 S.W.2d 646, 653] ["where the police enter a private residence in accordance with the emergency exception but are unable to preserve the evidence that they observe in plain view while rendering assistance, a second entry by other officers without a warrant is lawful, even though the emergency has passed, if the search that follows is restricted in nature and scope to securing the evidence observed in plain view by the officers who entered pursuant to the emergency exception"]; *People v. Reynolds* (Colo. 1983) 672 P.2d 529, 531–533 [where officers responded to an emergency call of a shooting, were let inside the residence by the defendant, and observed a body and other incriminating evidence in plain view, the court upheld a subsequent warrantless reentry by criminalists one hour and a half later for the photographing and extensive measurement of the murder scene]; *State v. Johnson* (Me. 1980) 413 A.2d 931, 933–934 [where local officers entered residence believing there was a dead body inside and while searching for other victims and suspects came across evidence in plain view, the court upheld the warrantless entry and search two hours later by a state police officer who processed the scene and collected such evidence for five hours]; *Taylor v. State* (Miss. 1999)

733 So.2d 251, 255–256 [court upheld warrantless reentry of officer to take pictures of evidence he had observed in plain view during initial, valid entry and search, and also upheld a warrantless entry of police captain 45 minutes later to observe and seize this evidence]; *State v. Jolley* (1984) 312 N.C. 296 [321 S.E.2d 883, 886–888] [court upheld warrantless entry of detective who photographed and seized evidence in plain view after officer, who initially entered in response to a call of a possible shooting, roped off the area and secured the scene]; *La Fournier v. State* (1979) 91 Wis.2d 61 [280 N.W.2d 746, 751] [court upheld warrantless entry of three officers who entered, arrested defendant, and found heroin on his person after emergency entry of initial officer who saw overdose victim, drug paraphernalia in plain view, and took victim to hospital, concluding the later entry by the three officers minutes after the initial entry and was "a continuation" of the first entry]; *Clark v. U.S.* (D.C. 1991) 593 A.2d 186, 196–199 [court upheld warrantless entry of police evidence technician to observe, photograph and seize incriminating evidence (as well as prepare a diagram) observed in plain view by an officer during his initial entry 30 minutes earlier]; *State v. Coulter* (Tenn.Crim.App. 2001) 67 S.W.3d 3, 39–45 [even though detectives conceded they could have obtained a warrant, the court upheld their warrantless entry and seizure of the murder weapon, dead body, and other incriminating evidence that was observed in plain view by officers who earlier entered lawfully based upon defendant's consent and statement that he had killed his wife]; *Jones v. Commonwealth* (1999) 29 Va.App. 363 [512 S.E.2d 165, 167–169] [court upheld warrantless entry of officer who confirmed the existence of a gun and narcotics earlier observed in plain view by fireman during his walkthrough of apartment after putting out fire, as well as the later warrantless entry of an investigator summoned by the officer, noting, "A warrant is not required in these circumstances because the defendant no longer has a reasonable expectation of privacy for that area of the apartment where one official validly on the premises has made the lawful discovery, and another is merely preserving the incriminating evidence."]; *Hunter v. Commonwealth* (1989) 8 Va.App. 81 [378 S.E.2d 634, 635–636] [court upheld warrantless entry of residence by detective to collect and preserve evidence previously observed in plain view by SWAT (special weapons and tactics) team during their initial entry to look for armed suspects in a house, concluding the detective's entry was "a continuation of the first lawful entry by the SWAT team"].)

Chapman's argument that the outcome in this case is controlled by *Mincey* and *Thompson v. Louisiana* (1984) 469 U.S. 17 [83 L.Ed.2d 246, 105 S.Ct. 409] (*Thompson*) is not persuasive. In *Mincey*, undercover police were involved in a shooting in an apartment unit. Within 10 minutes, homicide detectives descended on the scene and performed an exhaustive exploratory search that lasted four days and for which the sole justification advanced for lack of a warrant was the fact that the residence was the scene of a recent

homicide. (*Mincey, supra*, 437 U.S. at pp. 388–389.) The court held a homicide did not justify the warrantless four-day search. However, the court recognized that in rendering aid and removing bodies some evidence may permissibly be seized under established Fourth Amendment standards and remanded the case to the state court to determine to what extent, if any, the evidence found in the apartment was permissibly seized. (*Mincey*, at p. 395, fn. 9.)[4]

In *Thompson*, the court reiterated the rule announced in *Mincey* that a general " 'murder scene exception' " to the warrant requirement does not exist. (*Thompson, supra*, 469 U.S. at p. 21.) Homicide investigators conducted a " ' "general exploratory search for evidence" ' " after deputies had responded to a report of a homicide and searched the residence for suspects or other victims. (*Id.* at pp. 18–19.) The court held the warrantless search conducted by the homicide investigators did not come within any recognized exception to the warrant requirement and, therefore, violated the Fourth Amendment, as well as *Mincey*. (*Thompson*, at pp. 20–21; see also *Flippo v. West Virginia* (1999) 528 U.S. 11, 12, 14, fn. 2 [145 L.Ed.2d 16, 120 S.Ct. 7] [the court held warrantless search of a closed briefcase, which the trial court said was opened " 'in the ordinary course of investigating a homicide,' " violated the rule announced in *Mincey*]; *Boragno, supra*, 232 Cal.App.3d at pp. 392–393 [the court held the warrantless reentry of investigators between four or five hours after the initial entry by officers (including a sweep of the apartment plus the victim's removal) and the subsequent full-scale search, which lasted 13 hours from the time of the initial entry and included opening containers and seizing other items not in plain view, was invalid under the 4th Amend.].)

The present case is distinguishable from these cases because we are not dealing with a general exploratory search of a residence, for which a warrant would be required. Rather, we are presented with an uninterrupted police presence in the residence and a close-in-time successive search of areas already validly searched in order to begin processing and collecting evidence observed in plain view.

---

[4] We note that on remand to the Arizona court, the facts showed that 10 minutes after the initial entry by officers in response to the shooting, a detective, two technicians and a graphic art specialist entered the apartment without a warrant and took charge of the investigation. (*State v. Mincey* (1981) 130 Ariz. 389 [636 P.2d 637, 643].) These investigators arrived while the officers who initially entered were still on the premises. The investigators memorialized the evidence found in plain view, and then returned later to conduct what amounted to a four-day search. The court held the close-in-time entry of the detective and technicians was a continuation of the initial emergency entry and therefore the seizure of evidence observed in plain view was valid. (*Id.* at p. 649.)

Applying the principles discussed above to the present case, we conclude the trial court erred in suppressing evidence of the bullet holes in the walls, shell casings, bullet fragments (with the exception of the fragment in the refrigerator, which was *not* in plain view), the gun, the sledge hammer, Brian's body, and the surrounding blood evidence, as well as the observations of the second wave responders and photographs that concern this evidence. Because there was no Fourth Amendment violation as to this plain-view evidence, Chapman's statement to Detective Umansky also should not have been suppressed as tainted "fruit of the poisonous tree."[5]

## 4. *The Trial Court Erred in Rejecting Application of the Inevitable Discovery Doctrine*

The People also argue the minimal evidence recovered that was not in plain view (i.e., a single shell casing found beneath the victim's body after it was removed by the coroner, and a depression in the floor beneath the body) should not have been suppressed because it would have been subject to inevitable discovery. Specifically, the People contend that once the coroner took possession of the body, the shell casing and depression beneath the body would have become immediately obvious, and the coroner would have then provided them to law enforcement.

The People cite to *People v. Robles* (2000) 23 Cal.4th 789 [97 Cal.Rptr.2d 914, 3 P.3d 311] (*Robles*) to support their contention. In that case, a victim reported his car had been stolen. After police arrested the defendant, who the victim had earlier identified, an officer went to the defendant's residence, peeked through the hole of his garage, and saw a car matching the victim's license plate number. Instead of getting a warrant, the officer opened the garage door and called forensic personnel to process the car. (*Id.* at pp. 793–794.)

■ The court stated, "Under the inevitable discovery doctrine, illegally seized evidence may be used where it would have been discovered by the police through lawful means. As the United States Supreme Court has explained, the doctrine 'is in reality an extrapolation from the independent source doctrine: Since the tainted evidence would be admissible if in fact discovered through an independent source, it should be admissible if it

---

[5] Our ruling does not apply to statements made by Chapman concerning Detective Umansky's questions that related to the bloodstains he observed on one of the bedroom walls of the residence. The record is unclear as to the precise nature of this blood evidence and whether it was clearly in plain view. The People have simply failed to show the trial court erred in this aspect of its ruling.

inevitably would have been discovered.' [Citation.] The purpose of the inevitable discovery rule is to prevent the setting aside of convictions that would have been obtained without police misconduct. [Citation.] The burden of establishing that illegally seized evidence is admissible under the rule rests upon the government." (*Robles, supra,* 23 Cal.4th at pp. 800–801, italics omitted.) To establish inevitable discovery, the prosecution "must demonstrate by a preponderance of the evidence that, due to a separate line of investigation, application of routine police procedures, or some other circumstance, the [unlawfully obtained evidence] would have been discovered by lawful means." (*People v. Hughston* (2008) 168 Cal.App.4th 1062, 1072 [85 Cal.Rptr.3d 890] (*Hughston*); see also *U.S. v. Ramirez-Sandoval* (9th Cir. 1989) 872 F.2d 1392, 1396, 1399.)

The *Robles* court did not apply the inevitable discovery doctrine because the People recognized that "in the absence of exigent circumstances, a police officer is required to obtain a warrant to enter a residence even if contraband is clearly displayed in a window and the officer observes the contraband from a place in which he or she has a right to be" and that "the inevitable discovery doctrine would not serve to excuse a warrantless entry of a residence under the foregoing circumstances." (*Robles, supra,* 23 Cal.4th at p. 801.)

The trial court in this case similarly declined to apply the inevitable discovery doctrine, concluding there was no exception to the warrant requirement and that "to excuse the application for and issuance of a court search warrant would obviate the Fourth Amendment. There is no way around it. This court is not bound by decisions of the Ninth Circuit, but they are of guidance and should be considered seriously by this court." The trial court cited *U.S. v. Reilly* (9th Cir. 2000) 224 F.3d 986 and *United States v. Echegoyen* (9th Cir. 1986) 799 F.2d 1271 (*Echegoyen*). We conclude the court erred.

Courts have indicated a reluctance to apply the inevitable discovery doctrine when a search warrant was otherwise necessary and could have been obtained, as exemplified in *Robles*. For example, in *Hughston, supra,* 168 Cal.App.4th at page 1072, the court stated, "[T]he existence of sufficient probable cause to obtain a warrant to enter . . . and search . . . legally does not justify application of the inevitable discovery exception. ([*People v. Superior Court* (*Walker*) (2006) 143 Cal.App.4th 1183,] 1215 [49 Cal.Rptr.3d 831].) A violation of the Fourth Amendment may not be disregarded ' "simply because the police, had they thought about the situation more carefully, *could* have come up with a lawful means of achieving their desired results." [Citation.]' (*Walker,* at p. 1216, fn. 30; [citation]; [see also *U.S. v. Reilly, supra,* 224 F.3d at p.] 995 [' "to excuse the failure to obtain a warrant merely because the officers had probable cause and could have inevitably obtained a

warrant would completely obviate the warrant requirement of the [F]ourth [A]mendment" '].)" The court in *Echegoyen* came to the same conclusion. (*Echegoyen, supra,* 799 F.2d at p. 1280, fn. 7; see also *U.S. v. Mejia* (9th Cir. 1995) 69 F.3d 309, 320 [court explained it "has never applied the inevitable discovery exception so as to excuse the failure to obtain a search warrant where the police had probable cause but simply did not attempt to obtain a warrant"].)

Nonetheless, the People's argument in this case is not that the shell casing and depression found under the victim's body would have inevitably been discovered *because* they had probable cause to obtain a search warrant but failed to get one. Rather, the contention is that this evidence would have been lawfully discovered independently, i.e., by the coroner in the normal course of his legal duties. (See Gov. Code, § 27491.1 [coroner shall notify law enforcement agency regarding possible death by criminal means]; § 27491.2 [upon notification of a death, coroner shall immediately proceed to the location of the body, examine it, make inquiry into the circumstances and order its removal; it is a misdemeanor for another to move the body without permission of the coroner]; § 27491.3, subd. (b) [coroner may deliver any "property or evidence" related to the investigation or prosecution of a crime to the law enforcement agency or district attorney].)

Because there was a dead body in Chapman's residence, it is reasonable to expect the coroner would have been notified of the death, proceeded to the residence, removed the body, found the casing and depression, and then notified police according to law. Indeed, the coroner in this case was the one who moved Brian's body. It just happened that a criminalist was in the residence at the same time, and was therefore able to process the shell casing and depression found underneath it. Therefore, we agree with the People that the trial court erred in suppressing the shell casing and the casting taken of the depression.

## DISPOSITION

The petition for writ of mandate is granted, in part. The trial court is directed to vacate its order of May 20, 2011, partially granting Chapman's motion to suppress and instead issue a new order denying the motion, with the exception of the bullet fragment inside the refrigerator, which was not in plain view.

The trial court is further directed to vacate that part of its order of May 23, 2011, granting Chapman's motion to suppress his statements to Detective

Umansky, except that part of the order relating to Umansky's questions about bloodstains in the bedroom.

Our prior order staying the pending trial is vacated.

Bigelow, P. J., and Rubin, J., concurred.

The petition of real party in interest for review by the Supreme Court was denied June 2012, S202398.