Filed 6/30/15

CERTIFIED FOR PARTIAL PUBLICATION[*]

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>VERONICA LORRAINE DEHOYOS et al.,<br><br>    Defendants and Appellants. | D065961<br><br><br>(Super. Ct. No. SCD252670) |

APPEALS from a judgment of the Superior Court of San Diego County, Peter C. Deddeh, Gale E. Kaneshiro, and Lisa C. Schall, Judges. Affirmed.

Valerie G. Wass, under appointment by the Court of Appeal, for Defendant and Appellant Veronica Lorraine DeHoyos.

Lewis A. Wenzell, under appointment by the Court of Appeal, for Defendant and Appellant Gary Richard DeGraff.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal and Sean M. Rodriquez, Deputy Attorneys General, for Plaintiff and Respondent.

_____

[*]    Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of the Background and part I of the Discussion.

INTRODUCTION

A jury convicted Gary Richard DeGraff and Veronica Lorraine DeHoyos of possession of methamphetamine (Health & Saf. Code, § 11377, subd. (a).) The trial court suspended imposition of their sentences for three years and granted them formal probation.

They both appeal. DeGraff contends we must reverse his conviction because the trial court erred in failing to suppress the evidence against him. DeHoyos contends recent amendments to Health and Safety Code section 11377 require we reduce her conviction to a misdemeanor and remand the matter for resentencing. We are unpersuaded by these contentions and affirm the judgment.

BACKGROUND[1]

*Prosecution Evidence*

*Search of DeGraff*

San Diego Police Officers Andres Ruiz and Tyler Cockrell approached DeGraff while DeGraff was outside in front of his home cleaning his car. At the time, DeGraff's home was known to be a location where narcotics sales occurred. DeGraff agreed to speak with Ruiz. Ruiz asked him if he had ever been arrested and he stated he had. Ruiz asked him whether he was on probation or parole and he stated he was on probation. Ruiz asked whether he could search him and he responded, "Yes. I'm on probation."

_____

[1] The evidence presented at trial is not relevant to either issue raised on appeal. We base our summary on the evidence presented at the preliminary hearing as this is the evidence the trial court relied upon to decide DeGraff's suppression motion.

2

Officer Ruiz searched DeGraff and found a folded paper containing 1.72 grams of methamphetamine in his back right pocket. Ruiz started handcuffing him and he asked why he was being arrested. When Ruiz told him he was being arrested for the methamphetamine in his pocket, he hung his head and remarked, "Oh, f--k. I didn't know that was there. I forgot. It's not mine."

After Officer Ruiz searched DeGraff, arrested him, and placed him in a patrol car, Ruiz conducted a records check and learned DeGraff was not actually on probation. However, Ruiz testified that when he searched DeGraff, he believed DeGraff was on probation and under a search condition because DeGraff "seemed pretty adamant that he was on probation." When cross-examined about whether police department procedure required him to confirm the existence of a search condition in advance, Ruiz testified he had no knowledge of such a procedure. Rather, he understood he could "search somebody without confirming they're Fourth waiver if they tell you they're a Fourth waiver. You take that at their faith." Officer Cockrell had the same understanding.

*Search of DeHoyos*

As Officer Ruiz was arresting DeGraff, DeGraff yelled to his girlfriend DeHoyos. DeHoyos came outside and Officer Cockrell contacted her. He asked her whether she had anything illegal on her and whether he could search her. She replied, "Yeah. I don't have anything on me." He searched her and found a baggie containing .50 grams of methamphetamine in her right front pocket. He then arrested her and placed her in the patrol car.

3

*Search of DeGraff's Home*

After Officer Cockrell arrested DeHoyos, he asked DeGraff for permission to search his house. DeGraff verbally consented to the search. He also signed a written consent form after he had an opportunity to read the form and Cockrell read it to him. The consent form stated, "I, [DeGraff], having been informed of my constitutional right not to have a search made of the premises hereinafter mentioned without a search warrant, and of my right to refuse to consent to such a search, hereby authorized [the officers] to conduct a complete search of my premises … . [The officers] are authorized by me to take from my premises any letters, papers, materials, contraband or other property which they may desire." Immediately after this sentence are the handwritten words, "and garage!" DeGraff had Cockrell add this language to the form because DeGraff wanted the garage thoroughly searched since a friend had stayed there for awhile. The consent form then concluded, "This written permission is being given by me to the above named Officers voluntarily and without coercion, threats or promises of any kind."

Officer Ruiz searched DeGraff's home. He found a baggie containing 19.2 grams of methamphetamine in a bedroom being used as an office.

*Defense Evidence*

DeGraff testified Officer Cockrell initially asked him where "Eric" was. DeGraff believed Cockrell was referring to a person who had briefly lived in DeGraff's garage two months earlier.

4

DeGraff told the officers he did not know whether he was subject to a search condition and denied giving them permission to search him. After his arrest, he repeatedly attempted to tell Officer Cockrell not to search his home. He was not allowed to read the consent form before he signed it, and he only gave the officers permission to search his garage.

DeHoyos also testified. She said she came outside because Officer Cockrell called for her. Once she was outside, Cockrell immediately had her place her hands behind her back and started searching her. He did not ask for her consent. According to DeHoyos, she found the pants she was wearing in the garage and the methamphetamine found in the pocket was not hers.

*Suppression Motion*

DeGraff moved to suppress the evidence against him under Penal Code section 1538.5, subdivision (a).[2] The magistrate denied the motion, finding Officer Ruiz reasonably relied upon DeGraff's representation he was on probation. The magistrate also found DeGraff had voluntarily consented to the search of his house.

DeGraff later renewed his suppression motion under section 1538.5, subdivision (i). For the first time, he argued the search of his person was invalid because a San Diego police department procedure required officers to verify a suspect is subject to a valid

---

2    Further statutory references are also to the Penal Code unless otherwise stated.

search condition before searching him.[3]  The trial court denied the motion, finding Officer Ruiz reasonably relied upon DeGraff's representation as DeGraff was in the best position to know whether he was on probation and under a search condition.  The trial court also found DeGraff had voluntarily agreed to the search of his home.

DISCUSSION

I

*DeGraff's Appeal*

DeGraff contends we must reverse his conviction because Officer Ruiz's search of him was unlawful and, consequently, the trial court erred in denying his suppression motion.  More particularly, he contends Officer Ruiz should have and failed to verify DeGraff was under a search condition before conducting the search.

"In ruling on a motion to suppress, the trial court is charged with (1) finding the historical facts; (2) selecting the applicable rule of law; and (3) applying the latter to the former to determine whether or not the rule of law as applied to the established facts has been violated.  [Citation.]  On appeal, we review the trial court's resolution of the first inquiry, which involves questions of fact, under the deferential substantial-evidence standard, but subject the second and third inquiries to independent review." (*People v.*

---

[3]  Although DeGraff filed a copy of the procedure with his renewed suppression motion, the trial court declined to admit the procedure into evidence.  DeGraff is not directly challenging the court's evidentiary ruling.  Rather, DeGraff requested this court take judicial notice of the content of the procedure to establish the truth of certain matters asserted within it.  We conclude the content of the procedure is not properly subject to judicial notice and deny the request. (*In re Vicks* (2013) 56 Cal.4th 274, 314.)

*Parson* (2008) 44 Cal.4th 332, 345.) In conducting our review, we apply federal constitutional standards. (Cal. Const., art. I, § 24; *People v. Schmitz* (2012) 55 Cal.4th 909, 916.)

"The Fourth Amendment prohibits only those searches and seizures that are unreasonable." (*People v. Superior Court (Chapman)* (2012) 204 Cal.App.4th 1004, 1011, citing *Florida v. Jimeno* (1991) 500 U.S. 248, 250, and *Brigham City v. Stuart* (2006) 547 U.S. 398, 403.) Generally, "a search conducted without a warrant is per se unreasonable under the Fourth Amendment." (*Chapman*, *supra*, at p. 1011.) However, a probation search is a recognized exception to the warrant requirement provided as the decision to search is not arbitrary or intended to harass. (See *People v. Bravo* (1987) 43 Cal.3d 600, 607, 610.)

That DeGraff was not actually on probation and under a search condition when Officer Ruiz searched him is not dispositive. When a defendant tells an officer he is under a search condition, the officer may reasonably rely on the defendant's statement and evidence found during the search will not be suppressed if it later turns out the defendant was not under a search condition. (*In re Jeremy G.* (1998) 65 Cal.App.4th 553, 556 (*Jeremy G.*); see, e.g., *People v. Tellez* (1982) 128 Cal.App.3d 876, 879-880 [the court properly denied a suppression motion where officers conducted the challenged search based in part on a mistaken representation by defendant that defendant was on parole at the time of the search].)

That Officer Ruiz may have had the technological means to readily verify DeGraff's probation status or that the police department may have had a procedure

7

requiring such verification does not persuade us to disregard the holding in *Jeremy G.*, *supra*, 65 Cal.App.4th at page 556. As the trial court pointed out, DeGraff was in the best position to know whether he was on probation and under a search condition. We, therefore, cannot conclude it was objectively unreasonable for Officer Ruiz to rely on DeGraff's representation without verifying it.

## II

### *DeHoyos's Appeal*

#### A

##### 1

On November 4, 2014, while this appeal was pending, California voters approved The Safe Neighborhoods and Schools Act (Proposition 47). (Ballot Pamp., Gen. Elec. (Nov. 4, 2014) text of Prop. 47, § 1, p. 70.) It became effective the next day. (Cal. Const., art. II, § 10, subd. (a).) Among its provisions, Proposition 47 amended Health and Safety Code section 11377. (Ballot Pamp., Gen. Elec. (Nov. 4, 2014) text of Prop. 47, § 13, p. 73.) Prior to the amendment, possession of a controlled substance in violation of Health and Safety Code section 11377, subdivision (a), was punishable as either a felony or a misdemeanor. (*People v. Lynall* (2015) 233 Cal.App.4th 1102, 1108.) As a result of the amendment, the offense is now punishable as a misdemeanor "unless the defendant 'has one or more prior convictions' for an offense specified in [section 667], subdivision (e)(2)(C)(iv)—which lists serious and violent felonies that are sometimes referred to as ' "super strike" offenses'—or for an offense that requires the defendant to

8

register as a sex offender under section 290, subdivision (c)." (*People v. Lynall*, *supra*, at pp. 1108-1109.)

"Proposition 47 also created a new resentencing provision—section 1170.18. Under section 1170.18, a person 'currently serving' a felony sentence for an offense that is now a misdemeanor under Proposition 47, may petition to recall that sentence and request resentencing. (§ 1170.18, subd. (a).) A person who satisfies the statutory criteria shall have his or her sentence recalled and be 'resentenced to a misdemeanor … unless the court, in its discretion, determines that resentencing the petitioner would pose an unreasonable risk of danger to public safety.' (*Id.*, subd. (b).)" (*People v. Lynall*, *supra*, 233 Cal.App.4th at p. 1109.)

2

DeHoyos contends Proposition 47 applies retroactively to her because her case was not final when Proposition 47 became effective. Consequently, she contends she is automatically entitled to resentencing under amended Health and Safety Code section 11377 and is not required to utilize the resentencing procedure established in section 1170.18.[4]

---

4    The California Supreme Court is currently reviewing the analogous issue: Does the Three Strikes Reform Act of 2012 (§§ 667, subd. (e)(2)(C), 1170.12, subd. (c)(2)(C)), which reduces punishment for certain non-violent third-strike offenders, apply retroactively to a defendant who was sentenced before the Act's effective date but whose judgment was not final until after that date? (*People v. Conley*, review granted Aug. 14, 2013, S211275.)

The People do not dispute DeHoyos may be eligible for resentencing, but contend her remedy is limited to the procedure established in section 1170.18.  We agree with the People.

B

1

DeHoyos relies on the rule of retroactivity expressed in *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*).  "Under that rule, a legislative amendment that lessens criminal punishment is presumed to apply to all cases *not yet final* (the Legislature deeming its former penalty too severe), unless there is a 'saving clause' providing for prospective application."  (*People v. Smith* (2015) 234 Cal.App.4th 1460, 1464-1465; *People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1195-1196 [courts will assume, absent contrary evidence, the Legislature intended for an amended statute reducing punishment for a particular offense to apply to all defendants whose judgments are not yet final on the amended statute's operative date]; *People v. Brown* (2012) 54 Cal.4th 314, 323 [same].)

In this case, the parties do not dispute Proposition 47 lessens punishment and does not contain an express savings clause.  However, our inquiry does not end here.  (*People v. Nasalga* (1996) 12 Cal.4th 784, 793.)  We must also consider whether there are any other indicia of a legislative intent for Proposition 47 to apply prospectively, rather than retroactively.  (*Id*. at pp. 793-794.)  " '[W]hat is required is that the Legislature demonstrate its intention with sufficient clarity that a reviewing court can discern and effectuate it.' "  (*Id.* at p. 793.)

10

We believe the language of Proposition 47 states the Legislature's intent for prospective, not retroactive, application with the requisite clarity. Section 3 of the initiative measure, which is labeled "Purpose and Intent," states: "In enacting this act, it is the purpose and intent of the people of the State of California to: [¶] . . . [¶] (4) Authorize consideration of resentencing for anyone who is currently serving a sentence for any of the offenses listed herein that are now misdemeanors. [¶] (5) Require a thorough review of criminal history and risk assessment of any individuals before resentencing to ensure that they do not pose a risk to public safety." (Ballot Pamp., Gen. Elec. (Nov. 4, 2014) text of Prop. 47, § 3, p. 70.) Collectively, these two paragraphs indicate a legislative intent *not* to permit the automatic application of Proposition 47 to anyone currently serving a sentence for a listed offense. Instead, they indicate a legislative intent to authorize and allow resentencing only for those individuals whose criminal history and risk assessment warrant it.

Our interpretation of the legislative intent is consistent with the Legislative Analyst's analysis of Proposition 47. In describing the initiative measure, the analysis stated, "This measure allows offenders currently serving felony sentences for the above crimes *to apply* to have their felony sentences reduced to misdemeanor sentences. … However, no offender who has committed a specified severe crime could be resentenced or have their conviction changed. In addition, the measure states that a court is not required to resentence an offender currently serving a felony sentence if the court finds it

likely that the offender will commit a specified severe crime." (Ballot Pamp., Gen. Elec. (Nov. 4, 2014) analysis of Prop. 47 by Legislative Analyst, p. 36, italics added.)

Our interpretation of the legislative intent is also consistent with the ballot arguments. The opponents of the initiative measure argued the measure was "an invitation for disaster" in part because it would "make 10,000 felons eligible for early release." (Ballot Pamp., Gen. Elec. (Nov. 4, 2014) rebuttal to argument in favor of Prop. 47, p. 38; see also argument against Prop. 47, p. 39.) The proponents of the initiative countered by arguing, "*Proposition 47 does not require automatic release of anyone*. There is no automatic release. It includes strict protections to protect public safety and make sure rapists, murderers, molesters and the most dangerous criminals cannot benefit." (Ballot Pamp., Gen. Elec. (Nov. 4, 2014) rebuttal to argument against Prop. 47, p. 39.)

Given the legislative intent not to automatically apply Proposition 47 to persons currently serving sentences for listed offenses, DeHoyos has not established Proposition 47 applies retroactively to her. Instead, to be considered for resentencing, she must utilize the procedure specified in section 1170.18. (*People v. Noyan* (2014) 232 Cal.App.4th 657, 672.)

DISPOSITION

The judgment is affirmed.

McCONNELL, P. J.

WE CONCUR:

BENKE, J.

HALLER, J.